ANHEUSER-BUSCH, Inc., a Corporation, (Plaintiff) Respondent, v. LLOYD WEBER, RUSSELL L. DAVIS, WALTER PATRICK, THOMAS BLAKE, ALBERT MELTON, WINFIELD SCOTT MUSLER, ROBERT HAMMER, WILBERT A. REEB, BERNARD SIEMER and THOMAS MULVANEY, Individually and as Representatives of the International Association of Machinists, District No. 9, (Defendants) Appellants, No. 43522—265 S. W. (2d) 325.

Division One, February 8, 1954.

Motion for Rehearing or to Transfer to Banc Overruled in Per Curiam Opinion, March 8, 1954.

*Roessel, Boxdorfer & Brownell, Robert A. Roessel* and *Keith M. Brownell* for appellants.

*Mark D. Eagleton, Thomas F. Eagleton* and *J. J. Thyson* for respondent.

576

CONKLING, J.—Anheuser-Busch, Inc., hereinafter called plaintiff, operates a brewery and has its principal place of business and plant (covering about 72 city blocks) in the City of St. Louis, Missouri, where it has about 6000 employees. It is there engaged in manufacturing and selling beer, yeast, corn products and other commodities. It purchases and there uses large quantities of grains and other raw materials which are transported and delivered to it at its St. Louis plant by common and private carriers and otherwise. In its St. Louis plant it processes said raw materials into salable commodities. From its said plant it transports and distributes its manufactured commodities for sale to wholesalers, dealers and to warehouses locally and in other cities, by common and private carriers and in its own trucks. In its St. Louis plant plaintiff employs 220 Machinists who are members of the International Association of Machinists, District No. 9, hereinafter called the ''Union.'' Defendants are individually members of, and herein represent the entire class of persons who are members of District 9 of the Union. The Union is the bargaining agent of the above mentioned 220 Machinists. Defendants have appealed from a judgment of the Circuit Court of the City of St. Louis, which, after a hearing on the merits, on October 3, 1952, awarded plaintiff a permanent injunction against the defendants and the Union picketing plaintiff's plant.

There is no labor dispute between plaintiff and its employees, and no unfair labor practice is here involved. District No. 9 International Association of Machinists A. F. of L., and Anheuser-Busch, Inc., 101 N.L.R.B., page 346, Labor Management Relations Act, 1947 (Taft-Hartley Act) amending the National Labor Relations Act of 1935, 29 U.S.C.A., § 151, et seq., § 152(9).

The petition of plaintiff prayed an injunction to restrain the picketing of plaintiff's plant by defendants and the Union alleging that such picketing was in furtherance of an unlawful conspiracy, agreement and combination in restraint of trade in the transportation or competition in the importation, transportation, manufacture, purchase and sale of products and commodities in this State in violation of Section 416.010, RSMo. 1949, V.A.M.S.; that defendants and the Union members had unlawfully conspired and seek to compel plaintiff to conspire with the Union members against certain contractors and their employees, and that the picketing of plaintiff's plant was an illegal and coercive act of such conspiracy; and that as a result of such conspiracy and picketing plaintiff was prevented from receiving raw materials in transportation, operating its plant, and transporting its products.

Defendants answered admitting the Union did go on strike on April 7, 1952, and did then place a picket line around plaintiff's plant, and further alleged the picketing was without violence ''to tell the world of their position''; the answer also made denial of certain

allegations, and alleged plaintiff "has an adequate remedy at law and under the National Labor Relations Act, as amended, and the Labor Management Relations Act."

From the agreed statement of facts and from the evidence in the record before him, and now before us, the Chancellor could have found, and did factually find:

(1) That plaintiff's above noted manufacturing processes are continuous in nature and interrelated, and the involuntary stoppage of any or all such processes automatically results in progressive spoilage of partially processed grains, yeast, malt and other substances to plaintiff's extensive damage; that the Union members in plaintiff's employment are steadily employed in plaintiff's plant in the repair and maintenance of plaintiff's machinery and equipment therein; that plaintiff's business now and in the future requires and involves the regular and necessary expansion of its plant and facilities by constructing new buildings and expanding existing buildings, and installing, moving and perfecting new machinery and equipment therein, and that plaintiff does not have the means or facilities or equipment for doing that work with its own employees; that for 30 years it has been necessary to, and that new construction and expansion work has always regularly been contracted out by plaintiff to independent construction contractors and such work was not done by plaintiff through any of its regular or part time employees; that the only exception to that was in 1949, when, to end a controversy between the Union and certain Millwright employees of an independent contractor, plaintiff finished certain new machinery installation with its own regularly employed Machinists; that the finishing of that 1949 work by plaintiff resulted in a work stoppage on the construction job by the Carpenters (with whom the Millwrights are affiliated); that the above independent construction contractors perform their above mentioned work for plaintiff with their own employees who are represented under collective bargaining agreements by the Millwrights Union, an affiliate of the United Brotherhood of Carpenters, and those employees of the contractors are not subject to any control by plaintiff, and plaintiff does not employ, discharge or supervise the functions of any of those employees; that there is no contractor, large or small, in the St. Louis area whom plaintiff could select for its above new construction and expansion work whose employees are represented by the Machinists Union;

(2) That for at least 25 years the Machinists Union and the Millwrights have been engaged in an unresolved and continuing jurisdictional dispute regarding the representation of the above independent construction contractors' employees who move, erect and install machinery in buildings which have been expanded and enlarged, and in newly constructed buildings; that the Millwrights are affiliated with the Building and Construction Trades Council in St. Louis and the

Machinists Union is not a member of that Council; that the Millwrights and Machinists Unions each make recurring demands upon such independent contractors, and picketing has resulted, when demands are not met; that plaintiff is not a party to any of those jurisdictional disputes;

(3) That in the collective bargaining agreements between plaintiff and the Union, beginning with the first such agreement in 1948, and through the 1951 agreement, it was agreed by plaintiff, in Section 1 of Article VII, that all the therein listed Machinist work ''performed *within the employer's plant* by the employer shall be performed'' by the Union; that such agreement expressed the traditional relationship of the plaintiff and the Union over a 25 year period and has never been and is not now in dispute; that at the demand of defendants, the 1951 agreement of plaintiff and the Union also provided, in Section 2 of Article VII, that: ''In the event it becomes necessary to have such work hereinbefore described contracted out, the Employer shall let out such work to and select contractors who have the International Association of Machinists collective bargaining agreements which contain provisions corresponding to or consistent with the aforesaid jurisdictional limitations''; that in practice that provision was interpreted by the Union to require that in constructing new buildings and expanding existing ones plaintiff should let such proposed new construction and expansion work only to independent construction contractors who agreed to do the moving, erecting and installing of machinery therein with only employees represented by the Machinists Union, and the Union thereby sought to secure for Union members the work traditionally performed by members of other unions; that by such attempt of the Union to so obtain work it had never [328] before performed for plaintiff the Union sought, through the exercise of coercive pressure on plaintiff, to expand the scope of its representation to cover and include employees of the above independent construction contractors;

(4) That before the expiration date of the 1951 bargaining agreement plaintiff advised the Union that it could not agree to the reinsertion in the bargaining agreement for 1952 of the above set out Section 2 of Article VII, and that it had been advised by its legal counsel that, as above interpreted by the Union, Section 2 of Article VII would require and compel plaintiff to become a party with the Union to a common law conspiracy against the above independent construction contractors and their employees, and that such conspiracy was also in violation of Section 416.010 RSMo. 1949, V.A.M.S., the Missouri statute which declares combinations in restraint of trade to be a conspiracy;

(5) That in the negotiations for a collective bargaining agreement for 1952 between plaintiff and the Union, and prior to April 7, 1952, plaintiff and the Union were in accord with regard to all provisions

of the proposed 1952 agreement except the above set out Section 2 of Article VII; that in such negotiations the Union, through the individual defendants, made clear the Union's intention that plaintiff should refuse to contract any work to any independent construction contractor unless the latter would agree to do the work of moving, erecting and installing all machinery in connection with the construction of new buildings and the expansion of existing buildings with employees who were represented by the Machinists Union;

(6) That the Union announced its purpose and intention to obtain agreements similar to Section 2, Article VII, above, from all breweries in the St. Louis area so that under pressure from all the brewers the construction contractors would be compelled to bargain with the Union as bargaining representative for their employees moving, erecting and installing machinery notwithstanding those employees were already represented by the Millwrights' Union, or, the construction contractors would be compelled to replace their Millwright employees with Machinist employees; that to assist the Union to accomplish that end, plaintiff was directed by the Union to use pressure on the construction contractors and the other St. Louis area brewers;

(7) That under the terms as above sought to be imposed by the Union, persons employed by or seeking to work for the above construction contractors in moving, erecting or installing machinery in St. Louis area breweries would be compelled to forego representation by their present bargaining agent, the Millwrights' Union, with whom the said construction contractors now have valid collective bargaining agreements, and become affiliated with the Machinists' Union in order to retain their employment with such contractors or lose their opportunity for periodic employment at that work; that after the strike which started April 7, 1952, at plaintiff's plant, the Union did secure the inclusion of a clause identical with Section 2 of Article VII above in its 1952 bargaining agreement with the Griesedieck Western Brewery in Belleville, Illinois, and St. Louis;

(8) That the above conduct of defendants and the Union, individually and collectively, as against the construction contractors and their employees, constituted and was a conspiracy in violation of the above Section 416.010; that if plaintiff had agreed to the inclusion of the above Section 2 of Article VII into its 1952 bargaining agreement, as demanded by the defendants and the Union, under the interpretation defendants placed thereon and the result defendants intended to achieve thereby, plaintiff would have become party to an unlawful conspiracy and liable to all injured parties for their damages, and, under the above Missouri statute liable for treble damages and subject to criminal prosecution; that no bona fide labor dispute existed between plaintiff and the Machinists Union on April 7, 1952; that prior to that date defendants and the Union, both in and out of said bargaining negotiations, continued to raise specious and feigned points

580

and issues respecting matters as to which defendants were actually in accord with plaintiff, in order to give the false impression to the public that a labor dispute existed;

(9) That on April 7, 1952, solely to compel plaintiff to join in the above mentioned conspiracy with the Machinists Union against the above construction contractors and their above noted employees, defendants and the Union called a strike of Machinists at plaintiff's said plant and placed a picket line around said plant; that as as result of said strike plaintiff was unable to obtain a sufficient production force to operate its plant, and transportation in and out of plaintiff's plant ceased;

(10) That the picket line of the Union around plaintiff's plant was so placed, maintained, operated, utilized and manipulated that it effectively prevented the movement of loaded railroad freight cars into and out of plaintiff's premises and plant and effectively prevented and wholly stopped the transportation of raw materials into said plant or manufactured products therefrom without physical injury to the pickets and thereby effectively stopped the movement of cars and the transportation of plaintiff's raw material and manufactured products; that the necessary delivery of coal to said plant was likewise stopped in the same manner; that the physical presence and the above stated manipulation of said picket line made it impossible to transport supplies and raw materials into said plant and to transport plaintiff's processed materials out of plaintiff's said plant and because thereof plaintiff was forced to close its said plant for 12 days, during which time plaintiff suffered irreparable damages due to spoilage of partially processed grains and other materials which it could neither process to completion nor transport; that the conduct of defendants, individually, collectively, and as such Union, as directed against plaintiff for the purposes above, constituted and was a conspiracy at common law and was also in violation of said above Section 416.010.

The above findings and conclusions of the trial court were supported by substantial evidence.

It also appeared from the evidence heard by the Chancellor: (a) that the picketing of plaintiff's plant was unaccompanied by violence, other than as hereinafter noted; that plaintiff had in its employment building trades workers whose Unions were members of the Building and Construction Trades Council and plaintiff had collective bargaining agreements with such Unions covering such employees; that during the above contract negotiations defendants stated that unless plaintiff agreed to the reinsertion in the 1952 contract of the above Section 2 of Article VII defendants would speciously contend the parties were in disagreement on other contract provisions and would make further demands in other contract fields, because defendants were unwilling to openly acknowledge that Section 2 of Article VII was the only point in issue;

(b) That on April 9, 1952, the president of the plaintiff company met with defendant Lloyd Weber, business representative of the Union, at which time Mr. Weber stated that the reason he wanted Section 2 of Article VII in the Union's 1952 contract with plaintiff was that he, Mr. Weber, "had us (plaintiff) over the barrel, so to speak, and the pressure was against Anheuser-Busch, and that we (plaintiff) were the largest employers of Machinists and we (plaintiff) could control the contractors and force the contractors to employ Machinists"; that Mr. Weber stated that every other phase of the contract was acceptable but that Mr. Weber insisted that Section 2 of Article VII be also included in the contract; that Mr. Weber stated, "It had to be that or else"; that Mr. Weber also stated that Anheuser-Busch, because it was the largest employer of Machinists in the area, could put the pressure on the contractors and "the rest of the breweries would have to go along" and that "the Machinists could get the work now being done by the Millwrights";

(c) That during the picketing of plaintiff's plant a number of the pickets who were around plaintiff's plant and picketing the plant were upon the railroad tracks leading into and out of plaintiff's plant; that the transportation into and out of the plant was stopped "because it endangered their lives and limbs"; that the pickets would not clear the railroad track so the movement and transportation in and out of plaintiff's plant could be maintained; that the railroad motive power units pulling cars were moved to within 12 inches of the pickets and then stopped; that the pickets were moving onto and off of the track in a small compact circle but some of the pickets were constantly on the track in front of the train; that the train was stopped and the transportation thereby blocked to prevent physical injury to the pickets; that other pickets were "bunched rather heavily in front of our truck" delivering coal to plaintiff's brewery; that the truck ran to within 12 inches of the pickets and was prevented from proceeding further.

We think it clearly appears and we rule from the above noted substantial evidence that: (a) the above conduct of defendants and the Union, as directed against the independent construction contractors and their Millwright employees, constituted and was a conspiracy in violation of the common and statutory law of this State; (b) that the sole and unlawful purpose of the concerted action of defendants and the Union in picketing plaintiff's plant was to effectuate the Union's unlawful conspiracy and to compel and coerce plaintiff to join said conspiracy to violate the law by acquiescing in the Union's unlawful demands; (c) that the picketing of plaintiff's plant was effected by an agreement and combination of the members of the Union in restraint of trade and that such picketing was and constituted a local transportation combination which denied and unlawfully prevented the transportation of products and commodities to or from plaintiff's

plant, and the processing and manufacturing of products and commodities therein.

It seems clear to us that in picketing plaintiff's plant on April 7, 1952, and thereafter, defendants did so, not as the result of nor as any step in a labor dispute with plaintiff. In that picketing defendants took their final step in their effort to coerce and compel plaintiff to become an active participant in defendants' conspiracy against the independent contractors and their Millwright Union employees. The instant picketing by the Union was for an illegal purpose.

"A combination for the purpose of causing a breach of contract has been held to be an unlawful conspiracy. A person who by conspiring with another or by collusive agreement with him assists him to violate his contract with a third person and to obtain the benefit of that contract for himself commits an actionable wrong." Rosen v. Alside, Mo. Sup., 248 S. W. (2) 638, 643. Picketing for an unlawful purpose may be enjoined. Fred Wolferman, Inc. v. Root, 356 Mo. 976, 204 S. W. (2) 733, 174 A. L. R. 585, Kincaid-Webber Motor Co. v. Quinn et al., 362 Mo. 375, 241 S. W. (2) 886.

In Chapter 416 of the Missouri statutes respecting "Monopolies, Discriminations and Conspiracies," Section 416.010, "Combination in restraint of trade declared a conspiracy" it is provided that:

"Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition in the importation, transportation, manufacture, purchase or sale of any product or commodity in this state, or any article or thing bought or sold whatsover, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and shall be punished as provided in section 416.010 to 416.100, 416.240, 416.260 to 416.290 and 416.400. (8301)."

The above statute has been considered by the courts on prior occasions. Rogers v. Poteet, 355 Mo. 986, 199 S. W. (2) 378, Hobbs v. Poteet, 357 Mo. 152, 207 S. W. (2) 501, Empire Storage & Ice Co. v. Giboney et al., 357 Mo. 671, 210 S. W. (2) 55 and Giboney v. Empire Storage & Ice Co., 336 U. S. 490, 69 S. Ct. 685, 93 L. Ed. 834. Other cases could be cited.

In Rogers v. Poteet, supra, union members in combination with each other picketed a milk processing plant to prevent rural milk haulers, who were not union members but independent contractors, from transporting and delivering milk to processing plants. We held such concerted action was "a confederation in restraint of competition in the transportation of fresh fluid milk to all the milk processing plants in that area" in violation of the statute (now Section 416.010) which forbade restraint of competition in the transportation of commodities, and affirmed the lower court's injunction.

In Empire Storage & Ice Co. v. Giboney et al., supra, union members in combination with each other picketed Empire's plant to compel Empire to stop selling ice to non-union ice peddlers. Empire was thus threatened with the alternative of either ceasing to do business with some of its customers, or, "having its business destroyed through a local transportation combination substantially denying delivery service to or from its plant." ' In that case we ruled that the union used their "local transportation combination improperly to threaten and to produce injury and damage through a boycott of plaintiff's business, and incidentally to injure the business of citizens who are regular customers of its cold storage warehouse, by cutting off supplies to and from its customers"; that the purpose of the picketing violated Section 416.010, quoted above; that by the picketing the union was "attempting to force plaintiff to become a party to such combination"; and we affirmed the action of the lower court in enjoining the picketing of plaintiff's plant.

The Giboney case went on by appeal and, in a unanimous opinion, was affirmed by the United States Supreme Court on April 4, 1949. See 336 U. S. 490, 69 S. Ct. 685, 93 L. Ed. 834. That court upheld the Missouri injunction enjoining the picketing. In so doing the United States Supreme Court affirmed the validity of Section 416.010, stating that "Agreements and combinations * * * to dictate the terms under which transportation will be supplied," is a well recognized trade restraint practice "which both state and national legislation can and do prohibit"; that "there is nothing in the Constitution of the United States which precludes a state from adopting and enforcing such policy"; and that the constitutional guaranties do not "afford labor union members a peculiar immunity from laws against trade restraint combinations."

In the course of its Giboney opinion the United States Supreme Court further said: "We are without constitutional authority to modify or upset Missouri's determination that it is in the public interest to make combinations of workers subject to laws designed to keep the channels of trade wholly free and open. * * * Thus all of appellants' activities—their powerful transportation combination, their patrolling, their formation of a picket line warning union men not to cross at peril of their union membership, their publicizing—constituted a single and integrated course of conduct, which was in violation of Missouri's valid law. * * * Missouri has by statute regulated trade one way. The appellant union members have adopted a program to regulate it another way. The state has provided for enforcement of its statutory rule by imposing civil and criminal sanctions. The union has provided for enforcement of its rule by sanctions against union members who cross picket lines. * * * *We hold that the state's power to govern in this field is paramount,* and that nothing in the constitutional guaranties of speech or press compels a state to

584

apply or not to apply its antitrade restraint law to groups of workers, businessmen or others.'' [Emphasis supplied] We think that case rules the questions now before use.

Notwithstanding the above rulings defendants instantly contend that state courts are without jurisdiction in this character of case, asserting that under the provisions of the National Labor Relations Act and the Labor Management Relations Act, 1947, the Congress took over *all* controversies with labor by occupying the entire field of all possible Union activities. Defendants' reasoning or statements in their brief purporting to support such assertion are quite unclear and obscure. In any event we do not agree with that assertion. The above quoted opinion of the United States Supreme Court in the Giboney case was handed down nearly two years after the effective date of the Labor Management Relations Act (Taft-Hartley Act) in June, 1947.

As nearly as may be determined from their brief defendants' last stated contention seems to be based upon their ipse dixit that a labor dispute existed between the plaintiff and the Union, and that unfair labor practices are here involved. Defendants' instant brief many times asserts the existence of a labor dispute between these parties. Upon oral argument here the Union's counsel so stated. But upon the substantial evidence before him in this case, and under the provisions of the National Labor Relations Act and the Labor Management Relations Act, 1947, the trial chancellor properly found that no labor dispute existed between these parties. And too, this identical matter was before the National Labor Relations Board upon these facts in Case No. 14-CD-27, upon the Union's charge of unfair labor practices filed under the Labor Management Relations Act on March 24, 1952. In November, 1952, and after a full hearing, the National Labor Relations Board reviewed these facts at length in an opinion filed on November 18, 1952, 101 N.L.R.B., p. 346, No. 87. The National Labor Relations Board there squarely held that upon these facts no labor dispute existed between these parties and that no unfair labor practices were there involved, and the Board, upon such ruling, quashed the notice of the hearing.

The cases relied on by defendants are largely cases involving existing labor disputes and unfair labor practices. We think those cases are not in point.

Defendants rely upon Joseph Garner et al. v. Teamsters etc. Union, Case No. 56, decided by the United States Supreme Court on December 14, 1953, 74 S. Ct. 161, Capital Service v. National Labor Relations Board, 204 Fed. (2) 848, International Union v. O'Brien, 339 U. S. 454, 70 S. Ct. 781, 94 L. Ed. 978, Amazon Cotton Mill Co. v. Textile Workers Union, 167 Fed. (2) 183, California Ass'n of Employers v. Building and Construction Trades Council, 178 Fed. (2) 175, Beth-

lehem Steel Co. v. State Labor Board, 330 U. S. 767, 67 S. Ct. 1026, 91 L. Ed. 1234.

In Garner v. Teamsters Union, supra, the above court, in part, said: "The Supreme Court of the Commonwealth (Pennsylvania) held, quite correctly, we think, that petitioners' grievance fell within the jurisdiction of the National Labor Relations Board to prevent unfair labor practices." And the court there further stated: "The National Labor Management Relations Act, as we have before pointed out, leaves much to the States, though Congress has refrained from telling us how much. * * * Nor is there any suggestion that petitioners' plea of federal jurisdiction and pre-emption was frivolous and dilatory, or that the federal Board would decline to exercise its powers *once its jurisdiction was invoked.*" [Emphasis ours] In Capital Service v. National Labor Relations Board, supra, a Federal District Court had issued an injunction at request of National Labor Relations Board in a case presenting an unfair labor practice which was recognized as such by that Board. It was there correctly held that under those circumstances, the Federal jurisdiction was exclusive under § 160(a) of the Taft-Hartley Act. International Union v. O'Brien, supra, ruled only that certain provisions of the Michigan labor mediation law were invalid under the Commerce Clause of the Federal Constitution. In Amazon Cotton Mill Co. v. Textile Workers Union, supra, wherein the Union alleged that the employer was guilty of an unfair labor practice in refusing to bargain, it was held the Taft-Hartley Act did not vest the federal District Courts with co-ordinate jurisdiction with the National Labor Relations Board over unfair labor practices. In California Ass'n v. Building and Construction Trades Council, supra, it ▮▮▮▮ was held that the National Labor Relations Board has jurisdiction where defined unfair labor practices are at issue. In Bethlehem Steel Co. v. New York Labor Relations Board, supra, ruled prior to the effective date of the Taft-Hartley Act, it was held that the refusal of the National Labor Relations Board to recognize foremen's unions as appropriate units for collective bargaining did not leave the State authorities administering a State labor law free to do so.

Clearly the just above cases relied on by defendants do not support defendants' contention that the State circuit court was without jurisdiction in the case *now* before us. In the Garner, Capital Service, Amazon Cotton Mill and California Ass'n. cases, supra, unfair labor practices were squarely in issue, and jurisdiction of those cases was in the National Labor Relations Board under § 160(a) of the Labor Management Relations Act, 1947. The Bethlehem Steel and the International Union cases are not determinative of or related to the issue now before us. But these instant facts were before the National Labor Relations Board and no unfair labor practices and no labor dispute was found to exist. The National Labor Relations Board so ruled.

A jurisdictional quarrel between two rival labor unions is not a labor dispute within the Norris-La Guardia Act, the Wagner Act or the Taft-Hartley Act.

In Algoma Plywood & Veneer Company v. Wisconsin Employment Relations Board, (decided March 7, 1949, and subsequent to the effective date of the Labor Management Relations Act, 1947) the Supreme Court of the United States, 336 U. S. 301, 69 S. Ct. 584, 93 L.Ed. 702, said: "Since the enumeration by the Wagner Act and the Taft-Hartley Act of unfair labor practices over which the National Board has exclusive jurisdiction does not prevent the States from enforcing their own policies in matters not governed by the federal law, such freedom of action by a State cannot be lost because the National Board has once held an election under the Wagner Act. The character of activities left to State regulation is not changed by the fact of certification."

In International Union v. Wisconsin Employment Relations Board, 336 U. S. 245, 69 S. Ct. 516, 93 L. Ed. 651, (decided February 28, 1949) the United States Supreme Court considered the authority of the Wisconsin State Board to issue a cease and desist order. In that case bargaining proceedings between the union and the employer were deadlocked. To bring pressure on the employer, the union in five months called 27 union meetings at irregular times during working hours without notice, and without indication to the employer of how long the employees would cease work. The employer thus could make no dependable production plans or delivery commitments. Under the State Act the Wisconsin Board ordered the union to cease and desist such practices. The State Supreme Court affirmed. In holding the State Board had jurisdiction to make the above order the United States Supreme Court, in part, said: "Congress has not seen fit in either of these Acts (Wagner Act and Taft-Hartley Act) to declare either a general policy or to state specific rules as to their effects on state regulation on various phases of labor relations over which the several states traditionally have exercised control. * * * However, as to coercive tactics in labor controversies, we have said of the National Labor Relations Act what is equally true of the Labor Management Act of 1947, that Congress designedly left open an area for state control and that the intention of Congress to exclude the States from exerting their police power must be clearly manifested. * * * We find no basis for denying to Wisconsin the power, in governing her internal affairs, to regulate a course of conduct neither made a right under federal law nor a violation of it and which has the coercive effect obvious in this device." See also, Kincaid-Webber Motor Co. v. Quinn, supra, State ex rel. Allai v. Thatch, 361 Mo. 190, 234 S. W. (2) 1, 9.

The instant facts have presented to us, not a labor dispute or an unfair labor practice, but activities by and conduct of the Union

which were coercive tactics restraining freedom of trade, an internal affair over which this State has "traditionally exercised control." Many years ago, in the enactment of what is now Section 416.010, the legislature declared for Missouri the policy that it is in the public interest to keep trade channels free and open. In no federal legislation do we find any expression of congressional intention which would prevent this state from exercising its traditional and inherent police power in that respect. The State's power to govern in this field has always been held to be supreme.

For reasons above appearing, defendants' contention that the state circuit court was without jurisdiction to grant the injunction must be denied. And upon the facts before it, we must rule that the circuit court properly issued the instant injunction. Its action in so ordering the injunction to issue is affirmed.

█ Defendants also contend that the injunction order is too broad. This contention is based upon defendants' position taken here that a labor dispute existed between these parties; that the purpose of the picketing by the Union was not unlawful, and that the injunction issued in the circuit court violated defendants' rights to freedom of speech. Defendants cite Thornhill v. Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093. We have above ruled that no labor dispute existed between these parties and that the purpose of the picketing was unlawful and was in violation of a criminal statute.

In the Giboney case, supra, the United States Supreme Court discussed the case of Thornhill v. Alabama, supra, in this respect, and, held in the former case that the Union's entire activities in the picketing "constituted a single and integrated course of conduct, which was in violation of Missouri's valid law," and that the constitutional rights to freedom of the press and speech does not extend "its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." Under the instant pleadings and the evidence, and under the present state of this record, there having been no renunciation of any character filed, we see no basis whatever for the contention that the injunction order should be in anywise modified. The contention must be denied.

The judgment appealed from is affirmed. All concur.

█ PER CURIAM:—Defendants'-Appellants' motion for rehearing or to transfer to the Court En Banc asserts that Caldwell v. Anderson, 357 Mo. 1199, 212 S. W. (2) 784, and Douds v. Sheet Metal Workers, 101 Fed. Supp. 273, cited by defendants, are determinative and controlling of the issue presented us in this case, and complains that our opinion filed did not notice and discuss those cases. Those cases were examined and considered. We concluded that they did not rule the instant question.

In the Caldwell case, supra, plaintiffs employed only non-union labor upon a home construction project in St. Louis County. Having

been unable to persuade plaintiffs to employ union labor upon the construction project, defendants peacefully picketed the construction project. The purpose of the picketing was to compel plaintiffs to agree to employ upon the project only persons belonging to certain union organizations. We held the contract there sought was not unlawful and did not establish conspiracy. That case is not determinative of the issue presented to us in the instant case.

In the Douds case, supra, the petition filed on behalf of the National Labor Relations Board against the Sheet Metal Union sought injunctive relief on the ground that the union was engaged in a "secondary boycott" which the National Labor Relations Act had made an unfair labor practice. The court there ruled that the petition before it failed to allege facts which would establish a secondary boycott. The Douds case does not rule any issue now before us.

■■■■ The motion for rehearing calls to our attention that in Case No. 14-CD-27, reported in 101 N.L.R.B., page 346, No. 87, it was the plaintiffs' charges of unfair labor practices which were dismissed. That fact can make no difference whatever in our conclusions in this case. The Union and the Company had each filed against the other charges of unfair labor practices before the N.L.R.B. The Union's charges of unfair labor practices by the Company were disposed of on August 17, 1953, and at a time when the fact of the issuance of the instant injunction was before that Board. The Union's charges were disposed of in "Administrative Decision of the General Counsel, Case No. 766," found in C.C.H. Labor Law Reporter—Fourth Edition—2, Par. 12776, wherein it is stated: "A union charged each of four brewing companies with unlawful refusal to bargain. * * * Union also alleged that by seeking and obtaining an order from a State Court restraining the employees in engaging in striking and picketing, Company No. 1 (plaintiff in the instant case) violated Section 8(a)(1) of the [National Labor Management Relations] Act. * * * N.L.R.B. General Counsel sustained the Regional Director's refusal to issue a complaint."

It is not at all clear from defendants' briefs, nor from their motion for rehearing, just what section of what Act of Congress they are in fact relying on. If defendants' reliance be upon Section 8(b)(4)(D) of the Taft-Hartley Act it is obvious that the N.L.R.B. ruled that the instant facts were not of such character that Section 8(b)(4)(D) of that Act has any application thereto. Both the N.L.R.B. and its General Counsel, in his ruling, concluded that the N.L.R.B. had no jurisdiction whatever because neither a labor dispute nor an unfair labor practice was involved, and that there was no situation presented by the instant facts to which the Taft-Hartley Act applied.

The other points attempted to be asserted in appellants' motion for

rehearing are but a re-argument of the issues and matters ruled and determined in our opinion heretofore filed.

The motion for rehearing, or in the alternative to transfer the case to the Court En Banc, is accordingly overruled.