**CONTOUR CHAIR LOUNGE COMPANY, Inc., a Corporation and Contour Sales, Inc., a Corporation, Plaintiffs-Respondents,**

v.

**ALJEAN FURNITURE MANUFACTURING COMPANY, a Corporation, Joseph F. Laskowitz, Henry Koerner, Althea Koerner, and William Neiner, Defendants-Appellants.**

No. 32158.

St. Louis Court of Appeals.

Missouri.

April 19, 1966.

Motion for Rehearing or for Transfer to Supreme Court Denied May 23, 1966.

Application to Transfer Denied July 11, 1966.

Suelthaus & Krueger, Louis M. Kohn, St. Louis, for defendants-appellants.

Dubail, Judge & Kilker, William C. Maier, St. Louis, for plaintiffs-respondents.

DOERNER, Commissioner.

Defendants appeal from a judgment and decree enjoining them from competing with plaintiffs, in violation of a contract containing a covenant not to compete executed only by defendant Joseph F. Laskowitz.

Laskowitz is the designer and inventor of a distinctive type of chair with a movable one-piece top, shaped to fit the body, which moves in an arc on a stationary base. He caused the plaintiff Contour Chair Lounge Company, Inc., to be incorporated in 1947 to manufacture the chair, and the co-plaintiff Contour Sales, Inc., to be formed to sell the same, and was president of the former company and vice-president of the latter. Six design patents on the chair were granted to Laskowitz by the Commissioner of Patents, the principal one of which was No. 157,269, issued on February 14, 1950, for a term of 14 years. Laskowitz granted plaintiff Contour Chair Lounge Company, Inc. the exclusive right to manufacture and sell the contour-type chair, in return for royalties to be paid to him. The evidence indicates that Laskowitz was an officer of the plaintiff companies until 1955, when, presumably, he sold his stock in them. Thereafter he continued to receive royalties from plaintiff Contour Chair, and for the five years preceding December 17, 1958 was paid $66,804.50.

On that day, December 17, 1958, Laskowitz and plaintiff Contour Chair entered into a written agreement whereby Laskowitz sold and assigned his patents to Contour Chair in return for the sum of $180,000. The basic patent was then due to expire in slightly more than 5 years, on February 14, 1964. As part of the consideration Laskowitz agreed that for a period of 10 years from December 17, 1958, he would not:

"(a) Engage in or enter into, directly or indirectly, any business, enterprise or undertaking in competition with the First Party or the Contour Sales, Inc., a Missouri corporation, or any franchise or other dealer thereof; except as to conventional living room furniture, chairs convertible from a sitting to a reclining position, bed room suites, or kitchen, dinette or dining room furniture.

"(b) Directly or indirectly enter into, finance, invest in, or otherwise engage in any manufacture, development, research, sales or other business activity in the United States, its possessions or Canada relating to or involving furniture or

any other product or component of a product of the same general nature as those produced or sold by or for First Party; except as to conventional living room furniture, chairs convertible from a sitting to a reclining position, bed room suites, or kitchen, dinette or dining room furniture.

"(c) Sell, license, or otherwise transfer any mechanical or design patent now owned by or hereafter obtained by Second Party covering furniture or any other product or component of a product of the same general nature as those produced or sold by or for First Party; except as to conventional living room furniture, chairs convertible from a sitting to a reclining position, bed room suites, or kitchen, dinette or dining room furniture.

"(d) Use, attempt to use, directly or indirectly the names 'Contour', 'Contour Chair', 'Contour Chair Lounge', or any similar names in any form or relationship. In this connection Second Party acknowledges full title and ownership of said names to be in First Party."

On November 6, 1958, shortly before the execution of the foregoing agreement, Laskowitz and defendants Henry Koerner and William Neiner, his sons-in-law, executed articles of incorporation for defendant Aljean Furniture Manufacturing Company, the certificate for which was issued by the Secretary of State the following day. Laskowitz subscribed for 3 shares and Koerner and Neiner for 1 each, all at $100 per share. Laskowitz was elected president, Neiner vice-president, and Koerner secretary-treasurer, and the three composed the board of directors. Shortly thereafter, on December 11, 1958, pursuant to the board's action, Laskowitz sold $10,000 worth of machinery, equipment and raw materials to defendant Aljean Furniture in exchange for 100 shares of the company's stock. Within a short time he also loaned Aljean Furniture $13,943.11 in cash, and on October 19, 1959, this indebtedness was evidenced by a promissory note for that sum executed by Neiner as vice-president on behalf of the Aljean Furniture, payable on demand. Laskowitz, in addition, owns the real estate occupied by Aljean Furniture, and the evidence indicates that little, if any, rent was paid or an obligation therefor recognized prior to 1964.

According to the minute book of defendant Aljean, introduced in evidence, Laskowitz tendered his written resignation as the president and a director of that company, dated March 22, 1963. On or about the same day Laskowitz transferred 51½ of his 103 shares in Aljean to his daughter, Althea Koerner, and her husband, Henry Koerner, jointly; and his remaining 51½ shares jointly, to his other daughter, Jeanne Neiner, and her husband, William Neiner. He also assigned his note from Aljean Furniture to his daughters, jointly. On the following day, according to the minute book, the board of directors of Aljean Furniture accepted Laskowitz's resignations and elected Henry Koerner president, William Neiner secretary, and Althea Koerner a director.

As stated, the principal design patent issued to Laskowitz and assigned by him to plaintiff Contour Chair, under which plaintiffs made and sold their contour chair, expired on February 14, 1964. Shortly thereafter, and as early as March 11, 1964, defendant Aljean Furniture began to advertise and offer for sale a contour-type chair, under the name "Conforming" or "Conform" chair. There can be no dispute about the fact that to all appearances the two chairs are substantially alike. Both Laskowitz and Koerner readily admitted that to the average person the Conform Chair of Aljean Furniture would appear similar to the plaintiffs' Contour chair. The only marked difference, not apparent to the eye, to judge from the photographs introduced in evidence, is that the mechanism in the

Conform Chair of Aljean Furniture operates on a belt and buckle device whereas plaintiffs' Contour Chair operates on a ratchet system. According to the transcript, plaintiffs filed their original petition herein on January 2, 1964, prior to the expiration of the design patent. It is not included in the record before us, but in the amended petition on which the case was tried, filed on June 8, 1964, plaintiffs alleged that Laskowitz entered into a conspiracy with Henry Koerner, Althea Koerner and William Neiner to breach Laskowitz's contract of December 17, 1958 with plaintiff Contour Chair; and that the defendants, to accomplish said consiracy, had organized Aljean Furniture Manufacturing Company for the purpose of having it engage in the activity prohibited of Laskowitz by his agreement; that the individual defendants had caused Aljean Furniture, and had themselves, engaged in the research, development, manufacture and sale of a product similar to plaintiffs' product, in violation of the agreement made by Laskowitz; that defendants' chair was advertised and offered for sale under the name "Conform Lounge Chair," which was so similar to the name of plaintiffs' chair, "Contour Lounge Chair," that it was calculated to and would deceive, mislead and confuse the public and plaintiffs' customers; that unless defendants were restrained plaintiff would suffer permanent damage to their business; and that the amount of such damage could not be determined, and plaintiffs had no adequate remedy at law. Plaintiffs prayed for both a temporary and permanent injunction restraining defendants from engaging in the activities described.

The trial court granted plaintiffs a temporary injunction, and thereafter a permanent one. In its findings of fact and conclusions of law the trial court found, in effect, that Laskowitz had entered into the contract of December 17, 1958 with plaintiff Contour Chair containing the covenant not to compete for a period of 10 years; that defendants Aljean Furniture, Henry Koerner, Althea Koerner and William

Neiner knew of the restrictive covenant; that they nevertheless conspired with Laskowitz and with each other to violate the covenant, or acted as his agent in doing so; that both before and after the transfer by Laskowitz of his stock in Aljean Furniture the defendants had engaged in the research, development, manufacture and sale of a chair that is similar to the distinctive chair manufactured by plaintiff Contour Chair; that they had used the name "Conforming Chair" for their chair, which name was similar to and calculated to deceive the public and plaintiffs' customers, and to induce the erroneous belief that the defendant's chair is the same as plaintiffs'; that for carrying out their conspiracy with Laskowitz or performing the acts for him the defendant Aljean Furniture and the individual defendants became and were jointly and severally responsible and liable for the breach and violation of said contract; and that plaintiffs were without an adequate remedy at law. By its judgment and decree the court enjoined all of the defendants, their agents, employees, and all persons acting in concert with them from manufacturing, selling or offering for sale the Aljean Furniture Conforming Chair or any chair similar to that of plaintiffs' Contour Chair, until December 18, 1968. The defendants were also enjoined for the same period from using the words "Conform" and "Conforming" or any other word similar to "Contour" in connection with furniture.

In his separate answer Laskowitz attacked the validity of his contract of December 17, 1958, as being unreasonable as to area and time, and therefore void, but in defendants' joint brief it is expressly stated that he did not press that defense below and does not do so here. That issue, therefore, is not before us. Nor do the defendants contend that since February 17, 1964, Aljean Furniture has not engaged in direct competition with plaintiffs in the manufacture and sale of a chair substantially similar to the distinctive chair made and sold by plaintiffs. What the defendants do maintain is that inasmuch as Al-

jean Furniture, Koerner, Althea Koerner and Neiner were not parties to the agreement of December 17, 1958, they cannot properly be enjoined from engaging in such business competition with plaintiffs; that the evidence was insufficient to support the finding that Laskowitz breached his contract with plaintiff Contour Chair; that Aljean Furniture, Koerner, Althea Koerner and Neiner cannot be absolutely enjoined from using the names "Conform" and "Conforming"; and that since Laskowitz divested himself of all interest in Aljean Furniture, and it is not his alter ego, the court erred in enjoining that company.

It may be the general rule, as stated in 94 A.L.R. 341, 345, and as quoted in defendants' brief, that:

"The majority, and the better considered, of the cases, support the proposition that one who is in no sense a party to a covenant not to engage in a competing business cannot properly be enjoined from engaging in such business."

As do many general rules, however, this rule has its corollaries or exceptions. In the next succeeding paragraph of the same authority, but not quoted in defendants' brief, it is also stated:

"A stranger to the covenant may, however, properly be enjoined from aiding the covenantor in violating his covenant or receiving any benefit therefrom. So, a stranger to the covenant may well be enjoined from, in conjunction with the covenantor, or with his assistance, conducting a business in competition with the covenantee. * * *"

This is precisely the theory upon which plaintiffs based their claim for relief. As pleaded in their petition their claim was, in brief, that Koerner, Althea Koerner, Neiner and Aljean Furniture entered into a conspiracy with Laskowitz to violate and breach Laskowitz's agreement of December 17, 1958, with plaintiff Contour Chair, and to injure and destroy plaintiffs' business, by developing, manufacturing, selling and offering for sale, under a deceptively similar name, a chair substantially identical to plaintiffs' Contour Chair; and that pursuant to their agreement they combined and joined with him in the carrying out and execution of the conspiracy, to the actual and impending damage to plaintiffs' trade and business.

A civil conspiracy is an agreement or understanding between two or more persons to do an unlawful act, or to use unlawful means to do an act which is lawful. Royster v. Baker, Mo., 365 S.W.2d 496; Rosen v. Alside, Inc., Mo., 248 S.W.2d 638; Shaltupsky v. Brown Shoe Co., 350 Mo. 831, 168 S.W.2d 1083. The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff. Royster v. Baker, supra; Kansas City v. Rathford, 353 Mo. 1130, 186 S.W.2d 570; Medich v. Stippec, 335 Mo. 796, 73 S.W.2d 998. While no Missouri case is precisely similar to the instant one on all the facts, the principle has been well established that a combination for the purpose of causing a breach of contract by one of the parties thereto and resulting damage to the other is an unlawful conspiracy. As was said in Rosen v. Alside, Inc., Mo., 248 S.W.2d 638, 643:

"* * * A combination for the purpose of causing a breach of contract has been held to be an unlawful conspiracy. A person who by conspiring with another or by collusive agreement with him assists him to violate his contract with a third person and to obtain the benefit of that contract for himself commits an actionable wrong. Falstaff Brewing Corporation v. Iowa Fruit & Produce Co., 8 Cir., 112 F.2d 101; Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, and Annotation, 84 A.L.R. 98. * *"

And in the earlier case of Nokol Co. of Missouri v. Becker, 318 Mo. 292, 300 S.W. 1108, 1113, it was stated:

"While counsel for respective parties herein have not cited, and we have been

unable to find, any ruling of this court, or of our several Courts of Appeals, upon the precise question now before us, the well-reasoned utterances of the courts of other jurisdictions clearly and positively uphold the right of a complainant in equity to enforce the negative covenants of a contract by restraining or enjoining the opposite party to the contract, and also a third person or persons acting in concert with such party, from interfering with, or injuring, complainant in the exercise of his exclusive contractual rights, even though complainant be not entitled to a decree of specific performance against the opposite party to the contract."

To the same effect see Anheuser-Busch, Inc. v. Weber, 364 Mo. 573, 265 S.W.2d 325, reversed on other grounds, 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546; Byers Bros. Real Estate & Ins. Agency, Inc. v. Campbell, Mo.App., 329 S.W.2d 393 and 353 S.W.2d 102; Friedman Textile Co. v. Northland Shopping Center, Mo.App., 321 S.W.2d 9. And a combination to injure or destroy the trade, business or occupation of another is an unlawful conspiracy. Lohse Patent Door Co. v. Fuelle, 215 Mo. 421, 114 S.W. 997, 22 L.R.A.,N.S., 607; W. E. Stewart Land Co. v. Perkins, 290 Mo. 194, 234 S.W. 653. While civil conspiracy ordinarily sounds in tort, because the gist of the action is the wrong done by acts in furtherance of the conspiracy, Royster v. Baker, supra; Rippe v. Sutter, Mo., 292 S.W.2d 86; Kansas City v. Rathford, supra; yet where an action for damages will not afford an adequate remedy, equity will grant injunctive relief. Lohse Patent Door Co. v. Fuelle, supra; Nokol Co. of Missouri v. Becker, supra. In the light of the foregoing authorities we are of the opinion that if the evidence sustained plaintiffs' claim that Laskowitz and one or more of the other defendants entered into and carried into execution a conspiracy for the purposes and with the objectives stated, plaintiffs were entitled to injunctive relief against such conspirators, even though

some were not signers of or parties to the contract of December 17, 1958.

Our inquiry, then, must be broadened to determine not only whether Laskowitz violated his contract, but whether or not any of the other defendants conspired and acted in concert with him to that end. In that connection it is appropriate to point out that plaintiffs had the burden of proving the fact of the conspiracy, and the overt acts pursuant thereto, by clear and convincing evidence. State ex rel. Eagleton v. Stupp Bros. Bridge & Iron Co., Mo., 380 S.W.2d 382; Fitzpatrick v. Federer Realty Co., Mo., 351 S.W.2d 673. However, the courts have long recognized that an unlawful understanding or agreement is seldom, if ever, susceptible of direct proof, and it is therefore a well-settled rule that the conspiracy may be shown by circumstantial evidence. Sandler v. Schmidt, Mo., 263 S.W.2d 35; State ex rel. Prudential Ins. Co. of America v. Bland, 354 Mo. 495, 190 S.W.2d 234. Thus the conspiracy may be inferred from and proven by evidence showing the collusive and concerted actions of those alleged to be parties to it and the surrounding circumstances. Sandler v. Schmidt, supra; State ex rel. Prudential Ins. Co. of America v. Bland, supra; Medich v. Stippec, 335 Mo. 796, 73 S.W.2d 998. With these criteria in mind we turn to a review of the evidence.

There can be no doubt that Laskowitz was the moving spirit in the incorporation and subsequent operation of Aljean Furniture. Immediately after its inception in 1958 he became the owner of 103 of its outstanding 105 shares, and served as its president and as a member of its board of directors, on the record, at least, until March 1963. From the beginning the company occupied quarters in real estate owned by Laskowitz, and so far as the evidence shows little, if any, rent was ever paid him in cash. According to Koerner, Aljean Furniture never made any money, and Laskowitz testified that in 1959 he made a loan to the company, of which only $800 was ever

repaid and over $13,000, together with interest, remained due and payable by Aljean Furniture at the time this suit was filed. There was testimony by both Laskowitz and Koerner to the effect that from the time of its incorporation Koerner was the actual operating officer of Aljean Furniture, that Laskowitz was, " * * * more or less President in name only" and that Koerner, " * * * took care of all of the production of the furniture and also took care of the office." If Koerner was the actual operating officer of the Aljean Furniture from 1958 on, he showed an astonishing lack of knowledge of its affairs. For example, when his deposition was taken, on April 3, 1964, Koerner testified that until Laskowitz allegedly withdrew from the company in March, 1963, only 5 shares of stock had ever been issued, and that 100 more shares were then issued to Laskowitz; that he did not know how Laskowitz acquired the 100 shares and had no recollection as to whether Laskowitz paid in $10,000 in cash or the equivalent for the shares; and that Aljean Furniture was never indebted to Laskowitz. In his testimony during the subsequent trial he explained that after his deposition was taken he examined the company's books and then recalled the note that the company made to Laskowitz. When the court inquired whether, as president, he had not known that there was an outstanding indebtedness to Laskowitz his answer was, "I never paid that much attention to the books." Yet, before he became president of record, he was secretary-treasurer, and presumably in charge of the books of Aljean Furniture. At the trial Koerner also exhibited a similar lack of knowledge concerning the rent due from the company to Laskowitz for the space it occupied. Defendants' protests to the contrary, it is apparent that from its incorporation Laskowitz was the actual as well as the titular operating officer of Aljean Furniture, and that it was completely dominated and controlled by him.

Laskowitz testified that he never saw the Aljean Company's Conform Chair until April, 1964, and in his deposition, and in part read into evidence, Koerner insisted that no development work was done by him on Aljean's Conform Chair before February 15, 1964, the day after the principal patent expired. However, during the subsequent trial Arthur C. Ferro, plaintiffs' general manager and executive vice-president, and Mrs. Marge Daniels, their office manager, testified that during a visit made by Laskowitz to plaintiffs' plant in the summer of 1962 Laskowitz told them that he was going to build a contour-type chair when the patents expired; and that when Ferro remonstrated and reminded Laskowitz of the covenant in his contract, Laskowitz then changed his statement and said that Koerner would build them. Plaintiff also produced Joe Palazzolo, an upholsterer who had worked for plaintiff Contour Chair for 14 years, part of which time Laskowitz was its president, who stated that on the occasion when Laskowitz visited plaintiffs' factory in the summer of 1962 he asked Laskowitz whether he was going to make contour-type chairs, and that Laskowitz told him that when the patent went off he would probably do so. Palazzolo also related that in December, 1962 he had encountered Laskowitz at a fabric house, and that he again inquired whether Laskowitz was going to make contour-type chairs. Laskowitz's answer on that occasion, according to Palazzolo, was that he was going to retire but that Koerner might make them.

In their cross-examination of Ferro defendants developed that in the Fall or at the end of 1962, Georgia Van Leuven, who then worked for plaintiff Contour Chair but had previously been employed by defendant Aljean Furniture, described in detail to Ferro the contour-type chair which was then being developed at Aljean Furniture, including the safety belt mechanism. On redirect examination Ferro related that she had also told him that she had seen the drawings that Laskowitz had made of the chair. On inquiry by the court Ferro stated that Georgia Van Leuven had not said that she saw the chair in production, but that

she had seen the drawings of it and had described to him in detail how it was to operate.

On February 18, 1963, Earl N. Fleming, plaintiff's Contour Chair plant manager, at Ferro's request, went to the Aljean Furniture ostensibly as a purchaser. He was waited on by Laskowitz and made a down payment on a stationary-type chair made by Aljean Furniture. A lengthy conversation ensued, Fleming related, in which Laskowitz identified himself as the designer of the Contour chair, told him its history, and in the process made the statement several times that he was working on a contour-type chair, similar to plaintiffs' Model 100, which would be put on the market after February, 1964. Laskowitz also told him, Fleming stated, that dealers would be established in various cities he named.

Plaintiffs' witness Marion Dorsey, of Columbus, Ohio, who had retailed Contour chairs in that city since 1950, testified that on July 9, 1963, he bought a stationary-type chair from Aljean Furniture and that Koerner personally delivered it to him in Columbus later that summer. Dorsey stated that Koerner also brought with him in his delivery wagon a movable chair which Dorsey described, and identified from a photograph, as similar to plaintiffs' Contour chair. Koerner told him, Dorsey stated, that, "they" or "he" would build it when the patents expired. Dorsey also testified that he was in St. Louis in October, 1963, and had a conversation with both Laskowitz and Koerner at the Aljean Furniture plant about the chair that they would build when the patent ran out. Dorsey related that he insisted that they not build the contour-type chair until they were sure they were able to do it without any patent infringement, and that Laskowitz and Koerner said that the patent would run out in February, 1964, at which time they could build the contour-type chair. Dorsey said that he again visited the Aljean Furniture factory in the latter part of March or early in April, 1964, at which time Koerner and Neiner were present. They told him they were ready to build their chair and asked him if he wanted to handle it in Ohio. He stated that he bought such a chair from Aljean Furniture at that time.

Dorsey's testimony that Koerner had exhibited a movable contour-type chair to him in the summer of 1963 was substantiated by Kenneth D. Van Fossen and Robert W. Piper, two of his salesmen, both of whom testified that Koerner had also shown the chair to them in Columbus in August, 1963, during the Ohio State Fair. Van Fossen said that he discussed with Koerner the similarity of the chair to the Contour chair, and that Koerner said "they" were going to build the chair after the patent rights were out on the Contour chair. Koerner identified the "they" as "His company and their company." Piper stated that Koerner told him the chair would be available for the 1964 Ohio State Fair and that "we" were going to manufacture the chair, but did not say whom he referred to as "we."

On behalf of defendants, Koerner testified on direct examination that in March, 1963 he decided that he would make contour-type chairs when the patent ran out, and that Laskowitz resigned as president of Aljean because he was barred by his contract of December 17, 1958, from making them and had to terminate his relationship with Aljean Furniture. Despite his testimony in his deposition that he had not done any development work on such a chair prior to February 15, 1964, Koerner testified that he had shown Dorsey a movable-type chair in Columbus, Ohio, in August, 1963. On direct examination he stated that the chair shown Dorsey was different from those subsequently manufactured and sold by Aljean Furniture after February 14, 1964. But on cross-examination he conceded that the chair exhibited to Dorsey had the belt and buckle mechanism; and when pressed to state the differences between the chair shown Dorsey and the Aljean chair made after February, 1964, finally admitted that "Someone that didn't know would consider it the same chair, similar chair" and that overall it was so like the plaintiffs' Con-

tour chair that the ordinary public would take it to be a *Contour* chair.

■ We believe and hold that the foregoing evidence clearly and convincingly proved the conspiracy as to defendants Laskowitz, Koerner and Aljean Furniture, and their actions pursuant thereto. It is obvious that as early as 1962 Laskowitz and Koerner, with full knowledge by both of the restrictive covenants in Laskowitz's agreement of December 17, 1958, with plaintiff Contour Chair, and with the intent to evade and violate them, conceived a plan whereby Laskowitz would design and develop a contour-type chair similar to plaintiffs' Contour Chair; and that their chair would be manufactured and sold, ostensibly by Aljean Furniture and Koerner, in direct competition with plaintiffs after February 14, 1964, when the design patent expired. The evidence shows that Laskowitz began to develop Aljean's Conform Chair late in 1962. This in itself was a breach of that part of his contract in which he had agreed that he would not engage in the research and development of a contour-type chair. The evidence further shows that the chair had been developed by Laskowitz, Koerner and Aljean Furniture as early as the summer of 1963, when it was exhibited to Dorsey and his salesmen in Columbus, Ohio. The conclusion is inescapable that Laskowitz and Koerner delayed the manufacture and sale of their chair until after February 14, 1964, to lend color to their claim that only Aljean Furniture and Koerner, and not Laskowitz, was and had the right to compete with plaintiffs. Defendants stress their evidence that in March, 1963, Laskowitz severed all connection with Aljean Furniture. It is apparent that the trial court reached the conclusion, which we share, that Laskowitz's supposed withdrawal was part and parcel of the original plan to evade and violate the terms of his agreement, and that his alleged severance was one of fiction and not of fact. His statements, as well as those of Koerner, as to what would be done regarding the development and manufacture of their Conform Chair; his surreptitious development of the Conform Chair; the inconsistencies in Koerner's testimony, as well as his lack of knowledge of the business affairs of the company, both before and after he became president; and Laskowitz continued daily presence in the plant of Aljean Furniture after his alleged withdrawal, support that conclusion. We hold, therefore, that Laskowitz, Koerner, and Aljean Furniture were properly enjoined and restrained from manufacturing, selling and offering for sale their Conform or Conforming chair or any chair similar to plaintiffs' Contour chair, until December 18, 1968.

■ However, an equally careful and thorough study of the record has convinced us of the insufficiency of the evidence as to defendants William Neiner and Althea Koerner. While Neiner was an officer and director of Aljean Furniture from the time of its incorporation, his uncontradicted testimony was that it was a mere paper office. He was never employed by the company, took no part in its operation, and visited its offices only a few times a year, and then only for the purpose of socializing with Laskowitz and Koerner. Althea Koerner did not become a director of Aljean Furniture until March, 1963, and then in name only. There is no evidence in the record which indicates that either Neiner or Althea Koerner knew of the contract between plaintiff Contour Chair and Laskowitz. Rosen v. Alside Inc., Mo., 248 S.W.2d 638. Nor was there any evidence that they knew that Laskowitz, Koerner and Aljean Furniture were engaged in developing a chair similar to plaintiffs' Contour chair, for the purpose of competing with plaintiffs, or that they knowingly performed any act or took any action to further or carry out the unlawful purposes of the conspiracy. We hold therefore, that the judgment was erroneous and cannot stand as to them.

That part of the judgment and decree in favor of plaintiffs and against defendants Laskowitz, Koerner and Aljean Furniture Manufacturing Company is therefore affirmed, and that part in favor of plaintiffs

and against defendants Althea Koerner and William Neiner is reversed. All costs should be taxed against defendants Laskowitz, Koerner and Aljean Furniture Manufacturing Company.

PER CURIAM:

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

Accordingly, that part of judgment and decree in favor of plaintiffs and against defendants Laskowitz, Koerner and Aljean Furniture Manufacturing Company is affirmed; that part in favor of plaintiffs and against defendants Althea Koerner and William Neiner is reversed; all costs to be taxed against defendants Laskowitz, Koerner and Aljean Furniture Manufacturing Company.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.