from the claims of the purchasers Mooney and Kuziel.

The record on this issue is not in dispute. Never at any time did the record title to the real estate rest in O. W. Dickerson. Neither Mooney nor Kuziel signed the stipulation for decree in the Circuit Court of Phelps County or sought to influence the Court in entering the order.

Can the act of purchase of Mooney and Kuziel in proceeding on the basis of the "Business Lease", which we are here holding to be of no force, in so far as vesting any rights of sale in O. W. Dickerson as a trustee is concerned, be sustained on equitable ground?

At the time Mooney and Kuziel bought, Jessie Maude Mundis had been dead about a month. There was no administration on her estate at that time.

On the one hand it can be argued that the trust provisions of the "Business Lease" are so manifestly deficient and defective as to carry on their face proof of invalidity and notice to Mooney and Kuziel of that fact; on the other hand it can be urged that the instrument was not void *ab initio* as a trust, but voidable, as evidenced by proceedings to make it effective in the Circuit Court of Phelps County.

There being no evidence of bad faith on the part of either Mooney or Kuziel, and no foundation upon which to rest constructive notice of the plaintiff's claim, because record title never vested in O. W. Dickerson, we conclude it would be inequitable to penalize Mooney and Kuziel for failure to repudiate the right of O. W. Dickerson to sell as a trustee.

Plaintiff's notice of the levy was served on Mooney and Kuziel on December 7, 1948, and as of that service the innocence of the purchasers could no longer be maintained. They were put on their guard, or at least should have been, as reasonable persons, of the interest of O. W. Dickerson and the claim of plaintiff to that interest.

Plaintiff will submit decree, to include provision establishing a tax lien on a one-half interest in Trav-L-Odge, as the property of O. W. Dickerson, subject to repayment out of sale thereof of $5,375 to defendants Kuziels, representing one-half of the amount paid on purchase price of Trav-L-Odge prior to December 7, 1948; that said interest be sold and out of proceeds of sale said refund to defendants Kuziels be first made; that defendant O. W. Dickerson be ordered to pay to plaintiff, after deduction of the amount paid to Reed as balance on purchase price, one-half of amount received on sale consideration of Trav-L-Odge from defendants Kuziels and Mooneys, or either of them.

By apprporiate action defendants Kuziels may recover one-half of amount paid to Dewey Routh as trustee and Charles R. Sands, Circuit Clerk. This Court is without jurisdiction to enter such an order. The plaintiff has no interest in those funds. There is no diversity between the parties in interest.

**DOUDS on Behalf of NATIONAL LABOR RELATIONS BOARD v. SHEET METAL WORKERS INTERNATIONAL ASS'N, LOCAL UNION NO. 28.**

Civ. No. 12093.

United States District Court
E. D. New York.

Nov. 20, 1951.

274

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, Winthrop A. Johns, Asst. General Counsel, Samuel Ross, and Sanfjord B. Teu, II,

Attorneys, National Labor Relations Board, all of Washington, D. C., for petitioner.

Boudin, Cohn & Glickstein, New York City, Samuel Harris Cohen, Daniel W. Meyer, New York City, of counsel, for respondent.

GALSTON, District Judge.

Upon the petition filed pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(*l*), the petitioner seeks a temporary injunction against the respondent.

The petition recites that on or about July 16, 1951 Ferro-Co Corporation (hereinafter called Ferro-Co) filed a charge with the National Labor Relations Board (hereinafter referred to as the Board) alleging that the respondent had engaged and is engaging in unfair labor practices within the meaning of Section 8(b) (4) (A) of the National Labor Relations Act, 29 U. S.C.A. § 158(b) (4) (A). This charge was referred to the petitioner, as the Regional Director, for investigation. The petition recites that after such investigation he has reasonable cause to believe that the charge is true, and that a complaint of the Board based thereon should issue against the respondent.

It is alleged that Dierks Heating Co., Inc. (hereinafter called Dierks), is in the business of installing heating and ventilating systems in public buildings; and that the respondent has been the representative of the sheet metal employees of Dierks and other members of Heating, Piping and Air-conditioning Contractors, New York City Association (hereinafter called the Association) for the purpose of collective bargaining. For several years Dierks and other heating contractors, members of the Association, purchased radiator enclosures on special orders from Ferro-Co and other manufacturers of radiator enclosures who were not members of the Association and who do not employ members of the respondent.

The petition alleges that on or about June 22, 1951 the respondent induced the employees of Dierks and of other members of the Association to engage in a strike or concerted refusal, in the course of their employment by such employers, to use or otherwise handle or work on any products of Ferro-Co and other manufacturers of radiator enclosures who do not employ members of the respondent.

Because of such alleged violations of the Act, the petitioner seeks an injunction to enjoin the respondent, pending a final adjudication by the Board.

A hearing on the order to show cause was held beginning September 19, 1951, and the testimony of a number of witnesses was taken.

The issue in this proceeding then is to determine whether the alleged acts of the respondent fall within the provisions of Section 8(b) (4) (A), and thus constitute unfair labor practice. That section reads in part as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal * * * to use, * * * or otherwise handle or work on any goods * * *, where an object thereof is: (A) forcing or requiring * * * any employer or other person to cease using, selling, * * * or otherwise dealing in the products of any other producer, processor or manufacturer, or to cease doing business with any other person".

An article in the Harvard Law Review for March 1951, discussing the Taft-Hartley Act and referring to this section, suggests that: "Four fundamental issues have been involved in defining the extent of these restrictions: (1) What activities are forbidden? (2) What defenses may be attempted after apparent violations? (3) What parties are covered? (4) What remedies are given for violations?"

It is then observed by the writer of the article: "Probably no other provision of the LMRA is as difficult to understand as Section 8(b) (4) (A).

On first impression it would appear that the facts developed at the hearing warrant the conclusion that the primary object of the respondent was to compel Dierks and

all other members of the Association to employ only members of the respondent in connection with the manufacture and installation of radiator enclosures to be installed on construction jobs of the Association members.

Certainly as a result of the respondent's acts, since Ferro-Co did not employ members of the respondent in the manufacture of its radiator enclosures, Ferro-Co was prevented from furnishing its products to Dierks in the construction jobs undertaken by Dierks. So in terms at least the conduct of the respondent fell within the provisions of Section 8(b) (4) (A) of the Act, for, as' is said in the Yale Law Journal, Vol. 60, 684; "Read literally, 8(b) (4) (A) would invalidate most picketing."

 However, the authorities apparently do not give so generous a construction to the provisions of the quoted section. Recourse, therefore, was had by the courts to the legislative history in the effort to narrow such construction. As a result it was concluded that the purpose of this provision of the Taft-Hartley Act was to outlaw the "secondary" boycott, as constituting an unfair labor practice. Having then reached the conclusion that the unfair practice described in this section was that known under the common law as a secondary boycott, the trend of the decisions was to determine what a secondary boycott is. In passing it may well be observed that in International Brotherhood of Electrical Workers, Local 501 v. National Labor Relations Board, 2 Cir., 181 F.2d 34, at page 41, Judge Clark, in his dissenting opinion described as vague the terms "primary" and "secondary". He said these "are not terms of either science or art or of the statute and which serve only to confuse and to contradict". Nevertheless he too said that an avowed purpose of the Act was to prohibit "secondary boycotts". And the Supreme Court, in National Labor Relations Board v. Denver Building & Construction Trades Council et al., 341 U.S. 675, 71 S. Ct. 943, 95 L.Ed. 1284, explored the Congressional history of the Act to define its meaning. The court said, 341 U.S. at page 686, 71 S.Ct. at page 950:

"While § 8(b) (4) does not expressly mention 'primary' or 'secondary' disputes, strikes or boycotts, that section is often referred to in the Act's legislative history as one of the Act's 'secondary boycott sections.' * * *

"Senator Taft, who was the sponsor of the bill in the Senate * * * said, in discussing this section: '* * * under the provisions of the Norris-LaGuardia Act [29 U.S.C.A. § 101 et seq.], it became impossible to stop a secondary boycott or any other kind of a strike, no matter how unlawful it may have been at common law. All this provision of the bill does is to reverse the effect of the law as to secondary boycotts. * * *' "

After quoting language from Senator Taft's discussion of the bill in Congress, and the Conference Report to the House of Representatives on the bill, the Court, 341 U.S. at page 687, 71 S.Ct. at page 951, stated: "At the same time that §§ 7 and 13 safeguard collective bargaining, concerted activities and strikes between the primary parties to a labor dispute, § 8(b) (4) restricts a labor organization and its agents in the use of economic pressure where an object of it is to force an employer or other person to boycott someone else."

The National Labor Relations Board is also of the view that the legislative history of the Act makes it clear that the section was aimed at secondary and not primary action. See Oil Workers International Union and Pure Oil Company, 84 NLRB 315.

A secondary boycott has been defined as: "a combination not merely to refrain from dealing with complainant, or to advise or by peaceful means persuade complainant's customers to refrain ('primary boycott'), but to exercise coercive pressure upon such customers, actual or prospective, in order to cause them to withhold or withdraw patronage from complainant through fear of loss or damage to themselves should they deal with it." Duplex Printing Press Co. v. Deering, 254 U.S. 443, 446, 41 S.Ct. 172, 176, 65 L.Ed. 349.

Judge Learned Hand, in International Brotherhood of Electrical Workers, Local 501 et al. v. N.L.R.B. supra, 181 F.2d 34, 37, affirmed, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, defined a secondary boycott as follows: "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands."

These authorities are binding upon this court, and in consequence it follows that unless the petitioner herein has established that the act or acts of the respondent constitute a secondary boycott, an injunction cannot issue. Such a boycott exists when a labor organization having a labor dispute with employer A induces or encourages employees of employer B, with whom the union has no dispute, to refuse to handle goods or perform services for employer B, with the object of causing B to cease to do business with A, the employer with whom the union is involved in a labor dispute. In other words, what is prohibited is any attempt to bring pressure to bear on "secondary' employers who are neutral in the labor dispute for the purpose of effecting, by such measures, ultimate pressure upon the "primary" employer.

In the case at bar, the evidence establishes that if any labor dispute existed it was between respondent and Dierks. To enforce its position that, under the collective bargaining agreement with Dierks and other members of the Employers Association and the Contractors Association, the work of fabricating radiator enclosures to be installed on construction jobs of the associations' members was to be done by the respondent's members, the respondent engaged in a concerted refusal to handle or to install radiator enclosures fabricated by non-members. As a result of such action, Dierks was forced to suspend the installation of radiator enclosures purchased from Ferro-Co, since Ferro-Co's radiator enclosures were fabricated by members of another union not a local or affiliate of the Sheet Metal Workers' International Association.

These facts indicate that the respondent's concerted refusal to install the radiator enclosures at least ostensibly was directed at Dierks and through Dierks' employees. If the respondent's actions constitute a secondary boycott, Dierks must be regarded as the "secondary" employer who, by definition, is a neutral employer in a dispute between the respondent and a "primary" employer. The respondent's concerted action directed against Dierks, with the object, as the petitioner contends, of forcing Dierks to cease doing business with Ferro-Co, must likewise be regarded as having the purpose of inducing a settlement of a labor dispute between the respondent and Ferro-Co. Such relationship of the parties would indeed establish a secondary boycott.

However, the difficulty with labeling Ferro-Co as the "primary" employer is that the evidence fails to disclose any labor dispute between the respondent and Ferro-Co. At the hearing, Mr. Gamborg, plant manager and assistant secretary-treasurer of Ferro-Co, testified that no attempt had ever been made by the respondent to organize the employees of Ferro-Co, or to get Ferro-Co to recognize the respondent's local as the collective bargaining representative.

An examination of three recent cases involving Section 8(b) (4) (A) is helpful here. In all three, the Labor Board found that the union involved had engaged in a secondary boycott, and issued cease and desist orders. The Board was affirmed in two of the cases on review by the Court of Appeals. International Brotherhood of Electrical Workers, Local 105 v. N.L.R.B., supra; N.L.R.B. v. Local 74, United Brotherhood of Carpenters & Joiners of America, AFL, 6 Cir., 1950, 181 F.2d 126. In the third case, Denver Building & Construction Trades Council v. N.L.R.B., 87 U.S. App.D.C. 293, 186 F.2d 326, the Court of Appeals reversed the Board. On certiorari, the Supreme Court affirmed the first two, International Brotherhood of Electrical Workers, Local 105 v. N.L.R.B., 341 U.S. 694, 71 S.Ct. 954, 95, L.Ed. 1299; Local 74, United Brotherhood of Carpenters, etc. v. N.L.R.B., 341 U.S. 707, 71 S.Ct. 966, 95 L.

Ed. 1309; but reversed the Court of Appeals in the Denver Building Council case. In the last named case, a contractor erecting a building let out the electrical work to a nonunion subcontractor. All other subcontracts for brickwork, cement and steel work, and plumbing, were given to subcontractors hiring union workers. The Denver Building Council picketed the site, proclaiming by sign that the entire project was unfair and causing the union workers to quit work. As a consequence, the contractor advised the nonunion subcontractor that its services were terminated before it had finished work on the subcontract. In setting aside the Board's order, the Court of Appeals stated: "The picketing and resulting strike * * * grew out of a controversy over the conduct of the contractor in participating in the bringing of the nonunion men onto the job as well as over the conduct of the * * * subcontractor in employing them. The purpose of the Council was to render the particular job all union. It was not to require Gould & Preisner (the non-union subcontractor) to unionize their shop located elsewhere". 186 F.2d 326, 335.

The Court distinguished the Electrical Workers case, involving substantially similar facts, as follows: "The case is not unlike the present; but in reaching its conclusion the majority treated the carpenters and the principal contractor, on the latter of whom the pressure was exerted through the carpenters, as third party neutrals who had no concern in the dispute with the electrical (non-union) subcontractor."

As noted, the case was reversed by the Supreme Court, and the Board's finding of a secondary boycott was upheld. However, in reversing, the Supreme Court found: "In the background of the instant case there was a longstanding labor dispute between the Council and Gould & Preisner due to the latter's practice of employing nonunion workmen on construction jobs in Denver." 341 U.S. 675, 688, 71 S.Ct. 943, 951, 95 L.Ed. 1284.

■ Implicit in the idea of a secondary boycott is the fact that there is a labor dispute between a labor organization and an employer, and that the boycott charged is directed against another employer who is neutral to the dispute. In cases recently decided by the Supreme Court, reported in 341 U.S., 71 S.Ct., referred to above, the facts in each case disclose the existence of a labor dispute between the labor organization involved and the employer with whom another employer is forced to cease doing business because of a "boycott" directed against the second employer by the labor organization. In each case, the second employer against whom the "boycott" was directed was regarded by the Court as a neutral in the dispute considered to be the cause of the practices of the union found to be contrary to law.

Of course, it cannot be disputed that in the case at bar, the effect of the respondent's activities is to cause Dierks to cease doing business with Ferro-Co. In Oil Workers International Union and Pure Oil Co., 84 NLRB 315, 318, the Board stated: "A strike, by its very nature, inconveniences those who customarily do business with the struck employer. Moreover any accompanying picketing of the employer's premises is necessarily designed to induce and encourage third persons to cease doing business with the picketed employer. It does not follow, however, that such picketing is therefore proscribed by Section 8(b) (4) (A) of the Act."

The Labor Board has stated that "incidental" effects on the "secondary" employer do not convert lawful "primary" action into lawful "secondary" action; e. g. see Schultz Refrigerated Service, 87 NLRB 502, 508.

In N.L.R.B. v. Service Trade Chauffeurs, Salesmen & Helpers, Local 145 et al., 2 Cir., 1951, 191 F.2d 65, 67, the Court of Appeals stated: "The Taft-Hartley Act does not completely shelter neutrals in this case, so-called 'secondary' employers. If it did, strikes would often be hopelessly crippled. Instead the Act recognizes and undertakes to reconcile the competing claims of unions to strike and of bystanders to be free of harm from so-called 'secondary boycotts.' * * *"

Then, after quoting from N.L.R.B. v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, the Court

of Appeals stated as follows: "We take this (the Supreme Court's language) to mean that a union may lawfully inflict harm on a neutral employer, without violating § 8(b) (4), so long as the harm is merely incidental to a traditionally lawful primary strike, conducted at the place where the primary employer does business."

Thus in the case at bar, in view of the absence of any evidence of a labor dispute with Ferro-Co, it must be concluded that the respondent's dispute is primarily and solely with Dierks. Unquestionably, Ferro-Co, the neutral "secondary" employer, was also affected. However, the real objective of the respondent's actions was Dierks. In this connection also it may be noted that there is no evidence that a labor dispute, in the usual sense of the term, existed even between Dierks, the primary employer, and the respondent. The concerted refusal to install the radiator enclosures was the result of action taken by Dierks which he admitted was a mistake on his part. According to the evidence presented, Dierks conceded the validity of the respondent's position that, under the collective bargaining agreement between Dierks and the respondent, the fabrication of the radiator enclosures was to be done by the respondent or other members of the Sheet Metal Workers International Association. At no time did Dierks contest the validity of the respondent's stand with respect to the interpretation of the collective bargaining agreement.

Thus the circumstances shown to exist here fail to fit the case within the framework of the traditional concept of a secondary boycott. Of course, if evidence had been presented which indicated the existence of a labor dispute between Ferro-Co and the respondent, the fact that the respondent allegedly relied on the interpretation placed by the Joint Adjustment Board upon Article II of the collective bargaining agreement and based its actions upon it, would not justify the respondent's engaging in a secondary boycott. It is not a defense that other motives may have entered into the course of action taken by the respondent. See N.L.R.B. v. Denver Building & Construction Trades Council et al., supra; International Brotherhood of Electrical Workers et al. v. N.L.R.B., supra.

Conversely, where there is no labor dispute other than that with the employer against whom the work stoppage is directed, the fact that the union's concerted refusal to work or handle certain material affects that employer's business relations with a neutral employer does not require the conclusion that Section 8(b) (4) (A) has been violated. In the absence of evidence of a labor dispute with Ferro-Co, or any other employer than Dierks, it cannot be said that there is reasonable cause to believe that a violation of Section 8(b) (4) (A) has occurred. Therefore, it must be concluded that equitable relief here is not warranted.

The present petition is based upon a charge of an unfair labor practice within the meaning of Section 8(b) (4) (A). The court is not required at this time to determine whether there are reasonable grounds for finding an unfair labor practice coming within the proscriptions of some other section of the Taft-Hartley Act, or of some other statute.

For the foregoing reasons, therefore, the petition for injunctive relief, pursuant to Section 10(*l*) of the Labor Management Relations Act, as amended, 29 U.S.C.A. § 160(*l*), is denied. Settle order on notice.

Appropriate findings of fact and conclusions of law will be filed concurrently with this opinion.