TRUCK DRIVERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, LOCAL NO. 941 V. WHITFIELD TRANSPORTATION, INCORPORATED

No. A-4247. Decided December 15, 1954.
Rehearing overruled January 19, 1955.
(273 S.W. 2d Series 857)

*Mullinax & Wells* and *L. N. D. Wells, Jr.*, all of Dallas, for petitioners.

The Court of Civil Appeals erred in assuming jurisdiction to issue injunction relating to interstate commerce, and in applying the Texas statutes relating to Anti-trust laws and Secondary Boycott laws, as the jurisdiction in this case relating

to interstate commerce belongs exclusively to the Federal courts and to the Federal Congress under the Federal Motor Carrier Act and the Federal Labor Management Relation Act. St. Louis, Brownsville, etc., v. Brownsville Nav. Dist., 304 U. S. 295, 82 L. Ed. 1357, 58 Sup. Ct. Rep., 868; Midland Valley Ry. Co. v. Barkley, 276 U. S. 482, 48 Sup. Ct., 342; Gulf, C. & S. F. Ry. v. Moore, 98 Texas 302, 83 S.W. 362.

*Burges, Scott, Rasberry & Hulse, J. F. Hulse* and *William F. Smith,* all of El Paso, for respondent.

This suit was predicated not only upon a secondary boycott, but upon a violation by defendants and intervenor of the Texas Antitrust law, the enforcement of which is vested in the state courts; neither was it a suit against the Union, but was against defendant freight motor lines, the Union being an intervenor, its entrance into the suit did not change the jurisdiction which had become fixed when service was obtained against the defendants. Bethlehem Steel Co. v. New York S.L.R.B., 330 U. S. 767; Northeast Texas Motor Freight Lines v. Dickson, 148 Texas 35, 219 S.W. 2d 795; Johnson v. Middleton, 175 Fed. 2d 535.

### ON REHEARING

MR. JUSTICE GARWOOD delivered the opinion of the Court.

On motion for rehearing the first opinion handed down in this cause is withdrawn and the present opinion substituted therefor.

The respondent-plaintiff Whitfield Transportation, Inc., a motor carrier, doing no intrastate business in Texas but carrying freight between El Paso and points west of this state, sued certain other interstate carriers, with El Paso offices, which had theretofore been delivering to and receiving from respondent-plaintiff interstate freight at El Paso for further transportation, as interstate commerce, west or east, as the case might be. The object of the suit was in substance to enjoin these defendant carriers "and all other persons acting by or in concert with them" from suspending their above-mentioned practice, which, at least to some degree, they appear to have suspended following the picketing of the facilities of the respondent-plaintiff, Whitfield, in New Mexico by a union of Teamsters affiliated with the petitioner Union. The difficulty between the respondent-plaintiff and the New Mexico union is only remotely involved, since no picketing at El Paso by anyone is alleged,

and the suit is not directed at enjoining the New Mexico picketing. Neither the petitioner nor any other union or representative or member thereof was made a defendant, despite allegations that the defendants were "participating - - - in a secondary boycott against plaintiff" with the A. F. of L. Teamsters' Union "and/or other labor unions unknown to plaintiff." However, the essence of the alleged cause of action against the defendant carriers, as evidenced by the combined pleadings, proof, fact findings of the trial judge and the judgment, was the alleged conduct of our petitioner, its officers, agents and members, in threatening and coercing the defendants to discontinue their erstwhile connections at El Paso with the respondent-plaintiff, Whitfield. The effect of such alleged coercive conduct would be what is termed in law a secondary boycott against the respondent-plaintiff.

The six defendant carriers were somewhat less than half of the carriers with whom respondent-plaintiff Whitfield did similar business at El Paso. The petitioner Union had collective bargaining contracts with all the defendant carriers and with about half of the others. Five individuals, who were executives or agents of one or more defendant carriers, were also made defendants.

The sworn answers of the defendants, all represented by the same firm of attorneys, denied the allegations of the respondent-plaintiff, especially as to any conspiracy or concerted action or boycott against the latter, and in substance alleged that their suspension of business with the respondent-plaintiff was due to the refusal of their employees to handle the corresponding freight.

The petitioner Union intervened with permission of the court and assumed the position of a defendant. It pleaded to the jurisdiction of the court in that the legality of the conduct of the defendant carriers was a matter for determination of the Interstate Commerce Commission or the Railroad Commission of Texas and later raised the point of exclusive jurisdiction of the federal tribunals under the Labor Management Relations Act of 1947 (29 U.S.C.A., Sec. 151 et seq.). It further pleaded an adequate remedy at law on the part of the respondent-plaintiff, denied the existence of any conspiracy or combination between the defendants or between the petitioner Union and the defendants with the object of boycotting the respondent-plaintiff and denied that the petitioner Union had threatened any of the defendants. It affirmatively alleged that any suspension of busi-

ness on the part of the defendant carriers with the respondent-plaintiff was in the exercise of their own good business judgment and that the petitioner Union

"has advised several of Defendants of the fact that Plaintiff (respondent Whitfield) has refused to deal with other affiliates of the Teamsters' Union in the State of New Mexico and elsewhere and that it is advised that said other Teamsters' Local Unions, engaged in a labor dispute with Plaintiff, are engaged in lawful picketing of Plaintiff at Albuquerque, New Mexico, and Intervenor (petitioner union) would show that it has a right to advise Defendants of such fact."

Following a temporary restraining order, the case was tried to the court. Testimony was introduced by the respondent-plaintiff and the petitioner Union but not by the defendants, whose counsel also forebore to cross-examine the witnesses testifying. The trial court rendered judgment for the respondent-plaintiff, making in its decree sundry express findings of fact including the following:

"Members, agents, employees and representatives of the union combined to formulate and put into effect a plan to cause a secondary boycott to be instituted and carried on by defendants against plaintiff at El Paso, Texas, with respects to interline freight; that union by threats, express or implied, coerced the defendants into establishing and carrying on the said secondary boycott, defendant's action in this respect being put into effect pursuant to signal given by the Intervenor and kept in effect from that time until the issuance of the temporary restraining order issued in this cause; and that Intervenor, its agents, employees, representatives and members, and defendants, did combine and engage in said secondary boycott, and pursuant thereto did divert from plaintiff interline freight at El Paso, Texas, which otherwise would have been delivered by defendants to Plaintiff; * * * and that in connection with all of said acts of defendants and intervenor, their agents, representatives, members, and employees, there was a concert of action among them, and all of them."

The court concluded that the foregoing, and the consequent interference with commerce and injury to the respondent-plaintiff which were likewise found to exist, constituted

"a violation of the anti-trust laws of the State of Texas, and of the provisions of Article 5154f of the Vernon's Revised Civil Statutes of Texas, 1925, as amended and said acts on the part

of defendants and intervenor are illegal, and should be enjoined, * * *."

The injunction restrained the defendants, "their officers, agents, employees and servants, and Intervenor, * * * its officers, agents and members and all persons in active concert or participation with all parties herein restrained * * *" from (in effect) continuing to suspend any normal business with the respondent-plaintiff, except "if, after tendering it to plaintiff under preceding provisions of this injunction, plaintiff is unable to transport it, or deliver it in the ordinary course of business."

None of the defendants appealed, but the petitioner Union did, the judgment of the trial court being affirmed by the El Paso Court of Civil Appeals. 259 S.W. 2d 947.

■ We granted writ of error upon the point that the Labor Management Relations Act, supra, as applied in Garner v. Teamsters, etc. Union, 346 U. S. 485, 74 Sup. Ct. 373; Building Trades Council v. Kinard Construction Co., 346 U. S. 933, 74 Sup. Ct. 373; and Capital Service, Inc., v. National Labor Relations Board, 347 U. S. 501, 74 Sup. Ct. 699, had preempted for the appropriate federal tribunals controversies of the type here involved and so held in our original opinion, but, on reconsideration of the matter upon the motion for rehearing and amicus curiae briefs of the Attorney General of Texas and numerous others, have concluded that we were in error.

Whether we were correct or not in the view that the nature of this particular controversy (as gathered from the pleadings, evidence and findings) fell so clearly within the terms of the relevant portion of the Labor Management Relations Act of 1947, 29 U.S.C.A., Sec. 158(b) (4) as to render inapplicable the "express power" limitation of the Garner line of cases, this limitation is not the only one to be considered. The Garner opinion observes with evidently studied purpose that in that case it did not appear "that the federal Board (N.L.R.B.) would decline to exercise its powers once its jurisdiction was invoked." (346 U. S. 485, 74 Sup. Ct. 164) This limitation, repeated in the *per curiam* opinion in the Kinard Construction Co. case, 346 U. S. 933, 74 Sup. Ct. 373, was clearly recognized also in the recent decision of the Supreme Court of New Jersey in Busch & Sons, Inc., v. Retail Union of New Jersey, 15 N. J. 226, 104 A. 2nd 448. True, the court in the latter case applied the rule of the Garner case to the controversy before it (which, incidentally, was one of picketing and much closer to the Garner

case on the facts than the instant case) and actually overruled the argument for retention of state jurisdiction based on the alleged doubt as to whether the N.L.R.B. would take jurisdiction. However, the decision refused to apply the limitation in question only because no positive reason appeared in the particular case why the Board might not take jurisdiction. 104 Atl. 2nd 448, 452, Syl. par. 5.

In the instant case the positive reason exists and appears in the formally declared view of the Board that it has no jurisdiction. Matter of Local Union No. 878, etc., and Arkansas Express, Inc., 92 N.L.R.B. 255. That decision involved facts strikingly similar to the facts of the instant case, including particularly the matter of participation in the events said to constitute the boycott by the union member employees of the allegedly boycotting employers. True, the Busch case, supra, speaks in terms of a discretionary refusal of the Board to exercise actual ("express") powers (Art. 160 (b) ), but we perceive no practical difference between such a refusal and one based, as in the Arkansas Express, Inc., case, supra, upon the Board's view that it was not authorized to act. The resultant difficulty for a complainant urgently seeking a remedy is the same in both instances and would seem to make it as "futile" to apply to the Board in the one case as in the other. See the Kinard Construction Co. decision, supra.

■ We thus proceed to the merits of the case. The petitioner Union contends that there is no support in the evidence for the findings and judgment of the courts below, and we conclude this position to be well taken.

Obviously there was no conspiracy as between the defendants themselves, and we do not understand the respondent-plaintiff to assert that there was. The case for the respondent-plaintiff, as stated both in the findings of fact and the briefs of the respondent-plaintiff and *amici curiae* is one of a boycott by the defendants under coercion exercised by the petitioner Union upon the defendant carriers through the executives of the latter. As stated in the motion for rehearing (in connection with the jurisdictional question first above mentioned)

"We say, for the reasons set out above, that this Honorable Court erred in concluding by its own argument rather than by a reference to the record, that this secondary boycott was one where the Union induced or encouraged employees of defendant carriers to act, instead of being one where the coercion was applied to the employer itself * * *."

Among the "reasons set out above" is the statement that

"Petitioner (the petitioner Union) notified *supervisory employees* of the defendant (s). The Trial Court found and recited its judgment 'that Union by threats, express or implied, *coerced the* defendants, into establishing and carrying on the said secondary boycott * * *. This finding is sustained by the uncontradicted evidence, and is conclusive of the fact that this secondary boycott was operated by coercion applied to *employers,* namely, defendant trucking companies, their officers and managing agents."

The record, including the statement of facts which has been carefully read and reread, convinces us that not only is a finding of coercion of the management of the defendants by the union not sustained by the uncontradicted evidence, but that, on the contrary, it is without support in the evidence.

The much emphasized fact that an executive of the petitioner Union notified the defendant carriers that the respondent-plaintiff was picketed at points in New Mexico by an affiliated union is no evidence of coercion. That the picketing existed at the time is, indeed, sustained by the uncontradicted evidence, so that the statement was merely one of a fact, which obviously might, and in all probability would, have been learned about by the defendants within a brief time through their own union-member employees, if not otherwise.

We said, and properly so, in North East Texas Motor Lines, Inc. v. Dickson, 148 Texas 35, 219 S.W. 2d 795, 798, that "while peaceful picketing is free speech, it is more than free speech; it is economic coercion as well." But this is quite different from saying that for a union officer merely to telephone an officer of corporation A, with which the union has a bargaining contract, and tell him the fact that corporation B is being picketed, is coercion, economic or otherwise, still less illegal coercion. And even coercion by picketing may be a protected exercise of the right of free speech under the decisions of the Supreme Court of the United States, as we recognized to the point of voiding an injunction in Ex Parte Henry, 147 Texas 315, 215 S.W. 2d 588, and this, although the picketing had the additional effect of causing the employees of a railroad serving the picketed premises to refuse to operate trains thereto.

Considerable stress is also laid on the testimony of the officer of petitioner Union (Bone) who directed that the defendant carriers be advised of the New Mexico picketing, to the

effect that, while the object of the communication was to keep these companies advised of developments affecting transportation conditions, he at the same time hoped and expected that freight be diverted by those defendants as a result of the information thus imparted. In response to further questions he explained that he though that when the union employees of the defendant carriers knew about the picketing, they would, as union men, refuse to handle freight in which the respondent-plaintiff was interested. This was obviously no violent assumption on his part. He could well have had the same hopes and expectations without any information being given to the carriers, because surely their union employees would promptly hear about the picketing one way or another. The position of the respondent-plaintiff, as heretofore demonstrated by the words of its own counsel (when arguing the jurisdictional question) is that this is not a case of boycott pressure by the petitioner union through the employees of the defendant carriers. Otherwise Sec. 158 (b) (4) of the Labor Management Relations Act and the "philosophy" of the Garner line of cases would more likely be applicable. What Mr. Bone hoped or expected the union employees of the defendant carrier might do is thus beside the point. These thoughts of Mr. Bone were not evidence of any coercion exercised upon the executives, whatever may have been their probative value as to the matter of influencing the employees.

The fact that, about a week prior to the New Mexico picketing, the petitioner union participated, through officers or a committee, in a meeting of the Teamsters' Union "Joint Council No. 71," in which there also participated representatives of the local New Mexico union later conducting the picketing, and the further fact that the controversy between the latter union and the respondent-plaintiff was discussed in the meeting, are no evidence that the petitioner union or anyone else later coerced the management of the defendant carriers into boycotting the respondent-plaintiff. At most this merely confirms the already admitted fact that the petitioner Union knew about the New Mexico picketing by its affiliate when it occurred.

The additionally emphasized testimony for the respondent-plaintiff of its witness, defendant Ike Young, who was or had been an agent of one or two of the defendant carriers, to the effect that he "understood" he was being subjected to "an implied threat" of some sort from the Union is no evidence of coercion by the latter and, indeed, was admitted only "as against the defendants of whom he is agent" (he was agent for only

one when he testified). According to his testimony he was not even called by the Union, but "I was advised indirectly that, through one of my employees, rather, that there was a picket line at Whitfield's place of business at Albuquerque. I called the Teamsters' Union here at El Paso, and I think I talked to Mr. Thomas, and confirmed that fact." Evidently his original informant was one Cavender, "my dock foreman," whose connection, if any, with the petitioner Union does not appear from his own or Mr. Young's testimony, and according to Mr. Young, the Cavender information was merely "confirmed" by the union upon Young's own enquiry. The only fair interpretation of Mr. Young's testimony is that in no instance was he told anything except "that there was a picket line at Whitfield's place of business at Albuquerque." His own private inference that he was being somehow threatened by the Union is not evidence of coercion by the petitioner Union, even as against the one defendant carrier he represented at the time he testified. His testimony, incidentally, disclosed that his "understanding" or desire to play "good politics" with the Union was only one motive for diverting freight from the respondent-plaintiff, the other being that he "wanted that freight to get delivered — and didn't want it to get stuck behind the picket line up in Albuquerque some place."

The one item of testimony that has reasonably close logical relationship to the matter of coercion by the petitioner Union is the statement of Richard Harris, dock foreman of respondent-plaintiff and, of course, its witness. He testified that Mr. Ike Young abovementioned and a Mr. James Young, who was a rate clerk of the defendant Southern Express, told him over the telephone "that the union had called him and told him that he ought to divert freight from Whitfield because they were tied up * * *." Doubtless such a statement would be something in the way of persuasion as distinguished from a statement of fact, although it was apparently not the "uncontradicted evidence" which the respondent-plaintiff says supports the trial court's findings, since it was flatly contradicted by Ike and James W. Young respectively, the former being a witness called by the respondent-plaintiff. As regards the petitioner Union, the testimony was obviously hearsay and whether objected to or not when tendered, was without probative force. Texas Co. v. Lee, 138 Texas 167, 157 S.W. 2d 628; Winn v. Federal Land Bank of Houston, Texas Civ. App., 164 S.W. 2d 864, writ of error refused.

And to say that the declarations are incompetent as against

the petitioner Union is, under the facts of this case, to say that they are not competent to sustain the findings upon which the injunction is based. Those findings were findings that the petitioner Union coerced the defendants. How can it be said that the evidence is incompetent as against the party allegedly doing the coercing and yet is competent to show that the same party did coerce? We think it cannot. Moreover, the position of the defendants is relatively so little adverse to the position of the respondent-plaintiff that we cannot properly call the testimony in question competent as proof of an admission against interest of an adverse party as against that party. The position of the defendants is in effect that while their business with the respondent-plaintiff was in fact curtailed, their employees rather than the management did the curtailing or, in other words, that the operations of the defendants were to this extent controlled by certain of their employees below management status. Assuming this to be true, the employee action was obviously something that could only be hostile, rather than congenial, to the management, so that the plea of the defendants is thus essentially an affirmative claim of being coerced by their own employees. It would thus be of no great significance to the defendants that the coercion which they assert should be found by the court to come direct from union headquarters, and thus the statements allegedly made by the Youngs to the witness Harris were not admissions against interest in the true sense. That this is so is confirmed by the conduct of the litigation by the defendants, who, as stated, introduced no evidence, cross-examined no witnesses and did not appeal from the injunction. Plainly the real issue in the case lay between the respondent-Plaintiff and the petitioner Union. Of course, the alleged statements would have been competent if given by the Youngs themselves as witnesses, but, as stated, they were testified to only by an employee of the respondent-plaintiff, whose testimony was repudiated under oath by the Youngs.

In summary, the evidence discloses no more than that the petitioner Union did what it never denied doing—advising the defendants of the New Mexico picketing. This is not a violation of any statute of this state. If the case were one of picketing the defendants, which, as stated, we have recognized as itself an act of coercion, though also partaking of the character of speech, there might be a different result, because the act of coercion would be established and the only question would be whether the coercion was legitimate coercion. But, as we view the instant record, there is no evidence of coercion by the Union upon management. The whole case for the respondent-petitioner

hangs on what the union executives told the defendants about the New Mexico picketing. If they had said nothing, and the defendants had proceeded as they did, there would have been no claim of union coercion upon management, but at most a claim of union encouragement of employees of the defendants to bring about a boycott. The statement that the New Mexico picketing existed, as it did, and that the Union considered it lawful, is not to be taken as a threat just because a threat, if made, might conceivably have aided the union cause.

■ From the above conclusions it follows that, so far as the petitioner Union, its officers, agents and members are concerned, the injunction must be dissolved; and although, as stated, the defendants did not appeal, the same result should follow as to them. The rule that a reversal upon appeal by a party does not justify a reversal in favor of non-appealing parties is not invariable. Lockhart v. A. W. Snyder & Co., 139 Texas 411, 163 S.W. 2d 385; Saigh v. Monteith, 147 Texas 341, 215 S.W. 2d 610. Here the injunction was granted on the theory that the petitioner Union coerced the defendants. To hold that there is no evidence of coercion and thereby dissolve the injunction as against the petitioner Union while yet leaving the injunction in effect against the allegedly coerced defendants is to ignore substance in order to respect form, to absolve the petitioner Union of the charge of coercion and at the same time leave it convicted of the same offense, because the defendants did not choose to appeal.

The judgment of both courts below are reversed, and the injunction is dissolved.

Associate Justice Walker not sitting.

Opinion delivered December 15, 1954.

MR. JUSTICE SMITH, concurring in part and in part dissenting.

I concur with the majority opinion insofar as it holds that the trial court had jurisdiction to grant the injunctive relief sought by respondent, but I do not agree that the injunction

heretofore granted should be dissolved. I respectfully present the following opinion.

This suit was filed by respondent against six common carrier truck companies and five individuals, who were managers of the defendant-truck companies. The suit was not against the petitioner or any other labor organization.

The respondent plead a cause of action against the trucking companies for damages and for an injunction, and, if the evidence sustained the pleadings, the state court had jurisdiction and the injunction granted was warranted. The intervention of petitioner over respondent's objection or otherwise does not give the National Labor Relations Board and the Federal courts exclusive jurisdiction. The Garner case and other cases of like holding do not control the decision in this case. Respondent alleged in part:

"On or about the 14th day of April, 1952, the corporate defendants and the individual defendants notified plaintiff, either through said individual defendant or through other employees or agents of said corporate defendants, that they, and each of them, would not thereafter deliver to plaintiff any merchandise which might be in the course of transportation over their lines and the lines of plaintiff. Each of such corporate defendants and individual defendants, through such individual defendants, or other agents or employees of such corporate defendants, stated the sole and only reason for such action was that the aforenamed labor union or other unions unknown to this plaintiff had told the said defendants that they should divert their freight from plaintiff to some other carrier. Thereafter, on the 15th day of April, 1952, a shipment of merchandise which had been received by plaintiff for transportation by plaintiff over plaintiff's line, and for delivery by plaintiff to a connecting motor carrier at El Paso for transportation beyond El Paso, consisting of a total weight of 3,000 pounds, was tendered by plaintiff to defendant Texas-Arizona Motor Freight, Inc., for transportation over its lines to point of destination. Said shipment was tendered to said defendant in the regular course of business, and in accordance with the usual custom and practice as existing between the plaintiff and said defendant. Said defendant refused to accept such shipment wrongfully and without just cause, and its action in that respect was due to the Union's demands upon it."

The pleadings of the respondent are specific in alleging that

the wrong complained of was brought about by statements made by the Union to the defendant-carriers. These carriers were employers and not employees.

The defendant-carriers filed sworn answers in which they denied that they were acting jointly and in concert with each other, and in furtherance of a conspiracy and restraint of trade; or that they were participating with any Union in a secondary boycott.

Intervenor-petitioner's sworn answer, in part, alleged that it has advised several of the defendants of the fact that plaintiff has refused to deal with other affiliates of the Teamsters' Union in the State of New Mexico and elsewhere, and that it is advised that said other Teamsters' local unions, engaged in a labor dispute with plaintiff, are engaged in lawful picketing of plaintiff at Albuquerque, New Mexico, and intervenor would show that it has a right to advise defendants of such fact.

Some of the evidence which shows wrongful acts of coercion applied by the Union to defendant-carriers and a participation in a secondary boycott by the defendant-carriers against the respondent is as follows:

Mr. Fred A. Bone, Secretary-Treasurer of the Union, testified:

"Q. Now somebody on behalf of the Union did on the morning of Monday, April 14th, 1952, advise these truck lines who are defendants in this suit, that there was—that Whitfield was being picketed at Albuquerque, did they not?

"A. I couldn't say, I didn't.

"Q. Well you did say, didn't you Mr. Bone, in this answer of your Union which is referred to here as Intervenor, that said 'Intervenor would show that it has advised several of Defendants of the fact that Plaintiff has refused to deal with other affiliates of the Teamsters Union in the State of New Mexico and elsewhere and that it is advised that said other Teamsters' Local Unions, engaged in a labor dispute with plaintiff, are engaged in lawful picketing of Plaintiff at Albuquerque, New Mexico, and Intervenor would show that it has a right to advise Defendants of such fact.' You say you didn't know about that?

"A. My assistant may have notified the carriers. I didn't notify the carriers. I stated that I didn't notify the carriers. .

"Q. You didn't notify them. Well you know somebody representing the Union did do so?

"A. I presume that's right.

"Q. Well do you presume it, or is it a fact?

"A. Well—

"Q. It's right there and it is sworn to by you, isn't that a fact?

"A. Yes.

"Q. Well do you presume that, or is that a fact?

"A. I presume my assistant does what I tell him.

"Q. Well don't be mealy-mouthed about it. It's a fact, isn't it?

"MR. WELLS: What is a fact?

"Q. That somebody representing the Union in question, I originally asked him, notified these defendants on the morning of April the 14th, 1952, that they were picketing Whitfield at Albuquerque.?

"A. Yes, they were notified."

\* \* \*

"Q. And you expected as a result of that notification that freight would be diverted — interlined freight would be diverted from Whitfield at El Paso, did you not?

"A. I couldn't say that would be the reaction.

"Q. No, but you expected that, didn't you?

"A. I might have expected it — some members do and some members don't, so I expected the best part of it would be, yes.

"Q. You knew that the best part of the interline freight in El Paso would be diverted from Whitfield as a result of that notification?

"A. No, I didn't know it.

"Q. You firmly expected it, though, didn't you?

"A. I expected it."

Mr. Bone's assistant testified that he did so notify defendant-carriers.

The defendant's situation is shown in the testimony of J. I.

Young, the freight agent for defendant-carriers, Western Truck Lines, Ltd. and Gillette Motor Transport, Inc., who testified that in the interest of diplomatic relations with the Union on the part of his employers, he felt it unwise to tender freight to respondent, and that he asked permission of Mr. Thomas, an officer of petitioner-Union, to even accept freight from respondent since he felt that obtaining such permission was good politics with the Union; that petitioner-Union had collective bargaining contracts with the defendant-carriers. He further testified that had no such consent been obtained from the Union the employees of the two truck line-defendants for which he was agent would have refused to handle respondent's freight received by such lines. He also testified that he considered the notice from the Union of the presence of a picket line in Albuquerque an implied threat not to do business with respondent, and that since petitioner-Union would look favorably upon his refusing to give freight to Whitfield, his refusal so the interline was based upon what he thought the Union wanted him to do.

Richard Harris, the dock foreman for respondent in El Paso, Texas, testified that Ike Young, (the same person as J. I. Young previously mentioned), in a telephone conversation with Mr. Harris on April 14, 1952, told him that he had been instructed by the Union to divert freight from respondent; that James W. Young, the rate clerk for Southern Express, on that same day in another telephone conversation also told him that the petitioner-Union had instructed Southern Express to divert freight from respondent, and that Vernon Johnson, the warehouse-foreman of Texas-Arizona Motor Freight, and a member of petitioner-Union, in a telephone conversation with the said Harris on April 15, 1952, told him that Texas-Arizona Motor Freight would neither receive nor tender freight to respondent. The testimony of Richard Harris, dock foreman for respondent; Fred Romero, a truck driver for Whitfield; Ike Young, Manager of the two defendant-truck lines; A. D. Hall and Fred Bone, Union business agents, supports the findings of the trial court of a secondary boycott, and a violation of the Texas Anti-Trust laws by the defendant-trucking companies.

The trial court granted a perpetual injunction against the defendants, and made the following findings of fact in its judgment:

"The Court finds that plaintiff had no dispute with, or complaint from its employees, and that the Intervenor did not, at the time this suit was filed, or at the time of trial of this cause, claim to represent a majority of said employees, but that never-

theless members, agents, employees and representatives of the union combined to formulate and put into effect a plan to cause a secondary boycott to be instituted and carried on by defendants against plaintiff at El Paso, Texas, with respect to interline freight; that union by threats, express or implied, coerced the defendants into establishing and carrying on the said secondary boycott, defendant's action in this respect being put into effect pursuant to signal given by the Intervenor and kept in effect from that time until the issuance of the temporary restraining order issued in this cause; and that Intervenor, its agents, employees, representatives and members, and defendants, did combine and engage in said secondary boycott, and pursuant thereto did divert from plaintiff interline freight at El Paso, Texas, which otherwise would have been delivered by defendants to Plaintiff; and that Defendant Texas-Arizona Freight, Inc., pursuant to said plan and combination, refused to accept interline freight from plaintiff; and that in connection with all of said acts of defendants and intervenor, their agents, representatives, members, and employees, there was a concert of action among them, and all of them. That said concert of action, plan, and combination, was instituted and caried on for the purpose of causing injury or damage to plaintiff by withholding patronage from plaintiff, and that it interfered with the free flow of commerce, and that it created or tended to create retsrictions in trade or commerce. That said facts show a violation of the anti-trust laws of the State of Texas, and of the provisions of Article 5154f of the Vernon's Revised Civil Statutes of Texas, 1925, as amended, and said acts on the part of defendants and intervenor are illegal, and should be enjoined, and that said acts on the part of Intervenor and defendants, and each of them, will cause plaintiff irreparable injury, and that plaintiff has no adequate remedy at law."

It is my view—supported by decisions of the National Labor Relations Board, the United States Supreme Court and the Supreme Court of Texas, that respondent's cause of action against the defendant-employers for injunction and damages resulting from the wrongful acts of the defendants could not have been presented to the National Labor Relations Board, and, if presented, would have been dismissed. To hold otherwise would leave no power to the State and the respondent without a forum. The Labor Management Relations Act, or the so-called Taft-Hartley Act, does not cover this case, as it did the Garner case.

The statute involved applies only where a union engages in,

or induces or encourages the *employees* of an employer to engage in a strike or a concerted refusal to handle or transport goods or commodities when the Union had certain specified objects in view. The evidence clearly shows that the Union representatives did not approach the employees of the defendant-truck companies, but, on the contrary, all the evidence proves conclusively that the Union representatives coerced the employers—the six defendant-truck companies—into a concerted action, which resulted in the defendants' failure to interline freight with respondent, as they had theretofore been doing. Such action of the defendants began on April 14, 1952, and continued until about April 21, 1952, the date the temporary restraining order was granted in this case.

The Union aplied a secondary boycott by coercing other carriers who were employers. The employees of respondent, Whitfield, were not involved in the picketing and had no pending grievance or complaint against respondent. No demands had been made upon the respondent "with respect to Union terms or matters." The evidence shows that at the time of the action taken by the Union there were no "representations made by either the company's employees or * * * by the Teamsters' Union, to the effect that they represented a majority of the company's employees." A bout two years before the acts of the Union which gave rise to the present controversy, the National Labor Relations Board ordered a representation election. At that time, the Teamsters' Union claimed to represent the company's employees. The election was held and the Union lost by a vote of 37 to 6. No request was made thereafter by the Teamsters' Union, or any of its locals, that an election be held. At the time of and prior to establishing the picket line at Whitfield's place of business in Albuquerque, the intervenor-Union had not been certified by the National Labor Relations Board as the bargaining agent for the company's employees.

The only notice of any kind, prior to the picketing, was in the form of a letter, dated March 15, 1952. The letter bore no return address. The letter reads:

"It is the desire of the Representatives of the Teamsters Joint Council No. 71 to meet with Representatives of your Company to discuss issues of mutual interest to both parties.

"We would appreciate very much if you would notify us at your earliest possible convenience when it will be possible to arrange this meeting.

"If necessary, the Representatives of the Council can meet with you in Las Cruces."

Mr. Hull, General Manager for Whitfield, testified: "The letter showed no return address whatsoever." The Company did not reply to the letter. When asked whether Whitfield made any effort to reply to the letter, Mr. Hull stated, "No, because they didn't indicate in the letter that they represented any of the employees, or anything of that nature."

The evidence shows that the Union had lost in a fair election; that after the defeat, it entered upon a course of conduct which indicated a desire to ignore the vote of the employees of Whitfield, the National Labor Relations Board, and the rights of Whitfield. The election conducted two years before by the National Labor Relations Board was extremely disappointing to the Union. The record reveals a course of action and conduct on the part of the Union which resulted in material damage to Whitfield. The Union, by coercing the defendant-truck lines, who were employers, and not employees, caused Whitfield to lose more than $4,000.00 in interline freight business both at Albuquerque, New Mexico and El Paso, Texas. In the Garner case, 346 U. S. 485, 98 L. Ed. 161, 74 Sup. Ct. 161, 164, the Court said in part: "The National Labor Relations Act, as we have pointed out (citing Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 313, 93 L. Ed. 691, 69 Sup. Ct. 584; Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 773; 91 L. Ed. 1234, 67 Sup. Ct. 1026; Hill v. State of Florida ex rel Watson, 325 U. S. 538, 89 L. Ed. 1782, 65 Sup. Ct. 1373) leaves much to the states, though Congress has refrained from telling us how much."

The Court also said that where the National Labor Relations Board is without express power to prevent the injurious conduct of which complaint is made, it has "declined to find an implied exclusion of state powers." See International Union v. Wisconsin Board, 336 U. S. 245, 254, 93 L. Ed. 651, 69 Sup. Ct. 516.

In Rabouin, dba Conway's Express v. National Labor Relations Board, 195 F. 2d 906, Rabouin, a truck line operator, was engaged in arguments with the Teamsters' Union, in the course of which they undertook to bring pressure on him by requesting other truck line operators not to accept his shipments. This was held not to violate Section 8 (b) (4) of the Labor Management Relations Act, the Court saying:

"Petitioner also sees in the union's pressure on neutral employers to stop accepting his shipments a violation of the secondary boycott provisions. Sec. 8 (b) (A). Even if the demands carried with them an implicit threat to strike, we cannot agree that they tended to induce or encourage the employees to engage in a strike or concerted refusal forcing the employer to cease doing business with another. The embargo on Rabouin's goods was the product solely of requests addressed to management or supervisory personnel. The former are clearly employers, and the latter have lately been so defined by the new Section 2 (2, 11), 29 U. S. C. A. Sec. 152 (2, 11). The union thus did not 'encourage the employees.' "

In Douds, on behalf of National Labor Relations Board., v. Sheet Metal Workers, 101 Fed| Supl. 273, 970, 972 (on rehearing) there was involved a boycott of the products of Ferro-Co., who did not employ members of the Sheet Metal Union. An injunction was sought in the United States District Court, Eastern District of New York, by Douds as Regional Director of the National Labor Relations Board. It was alleged that the Union had committed an unfair labor practice by establishing a boycott prohibited by Section 8, (b) (4) (A) of the National Labor Relations Act. The injunction was denied and the Court, among other things, said:

"Viewing the situation realistically, what the petitioner seeks to enjoin here is, of course, the boycott by the respondent of the goods manufactured by Ferro-Co. But the evidence shows that the boycott was accomplished by the respondent, not by inducing or encouraging the employees of Dierks to engage in a strike or concerted refusal to handle Ferro-Co's products, but because of an agreement with the Heating Assaciation representing a group of employers. That agreement provided that the work of fabricating and installing radiator enclosures on jobs contracted by the Association members would be performed by members of the Sheet Metal Workers International. Whatever objections can be taken to such agreement as being contrary to law, it cannot be regarded as a violation of Section 8 (b) (4) (A), because the evidence fails to show that the respondent, in achieving its objective, induced or encouraged the employees of any employer to engage in an unfair labor practice as defined therein."

A union is not engaged in unfair labor practices within the meaning of Section 8 (b) (4) (A) of the Act where the evidence shows coercion by the union upon secondary employers

and does not show any inducement or encouragement of the employees of such secondary employers. Sheet Metal Workers, etc., and Ferro-Co. Corp., 102 N.L.R.B. 1660; Local Union No. 50, etc. and Clyde M. Furr, 98 N.L.R.B. 128; Arkansas Express, Inc., 92 N.L.R.B. 255. In Arkansas Express, Inc., the Board said:

"The record clearly shows, and we find, that the Respondent, in aid of its primary dispute with Arkansas, brought pressure upon the other carrier-secondary employers-to boycott Arkansas completely. The terminal manager of Highway Express testified that, sometime between February 6 and February 20, the Respondent Union's assistant business agent, James Harrison, told him that Highway Express could not call Arkansas for a pickup because there would be 'nobody to check the freight'; and that if Highway Express made the call the men 'might walk out' with 'the sanction of the Union'. * * * The principal issue raised by the motion, therefore, is whether the General Counsel has proved that the Respondent induced the employees of the other carriers to refuse to handle Arkansas freight in the course of their employment. * * * As its main defense, and in support of the motion, the Respondent insists that notwithstanding the clear evidence of secondary objective or inducement of secondary employers, the General Counsel has not shown any inducement by the Respondent of employees (other than those of Arkansas, the primary employer)."

The Board, in the above case, held that the evidence showed coercion by the Union upon the secondary employers and did not show any inducement or encouragement of the employees of such secondary employers and that the union for that reason was not engaged in unfair labor practices within the meaning of Section 8 (b) (4) (A) of the Act.

In the Garner case, the evidence showed that the National Labor Relations Board had express power to act. The facts brought the court to the conclusion: "This is not an instance of injurious conduct which the National Labor Relations Board is without express power to prevent and, which, therefore, either is 'governable by the state or it is entitrely ungoverned'."

The position of the union that the state courts are without jurisdiction and that the National Labor Relations Board and the Federal courts have preempted the field in all cases involving interstate commerce is wholly unsupported by the authorities. The fact in this case bring it squarely within the principle

announced in the cases of Giboney v. Empire Storage & Ice Co., 336 U. S. 490, 93 L. Ed. 834, 69 Sup. Ct. 684; Best Motor Lines, Inc. v. Int. Bro., etc., 150 Texas 95, 237 S.W. 2d 589 and Anheuser-Busch, Inc. v. Weber, et al, 364 Mo. 573, 265 S.W. 2d 325. The trial court in the present case found a conspiracy on the part of the defendant-truck lines and the Union in restraint of trade and that such act was in violation of the Texas Anti-Trust laws. This was one of the grounds for the issuance of the injunction. I see no valid reason to waiver in the least from the holding this Court made in the Best Motor Lines case, supra, wherein we said: "The Texas Anti-Trust Statutes are valid laws and all persons are subject thereto, and the courts have the power to enjoin acts and conduct in violation thereof. Labor unions are not excepted, even though there exists a labor dispute and the picketing is peaceful."

The recent case of United Construction Workers, Affiliated with the United Mine Workers of America, et al v. Laburnum Construction Corporation 347 U. S. 656, 74 Sup. Ct. 833, 834, involved the question as to "whether the Labor Management Relations Act, 1947, had given the National Labor Relations Board such exclusive jurisdiction over the subject matter of a common-law tort action for damages as to preclude an appropriate state court from hearing and determining its issues where such conduct constitutes an unfair labor practice under that Act." The Court held against the contention of the Union. In discussing the jurisdictional question, the Court said: "We accept the view of the National Labor Relations Board that respondent's activities affect interstate commerce within the meaning of the Labor Management Relations Act." The contention of the petitioner-union was stated and the Court held as follows:

"Petitioners contend that the Act of 1947 has occupied the labor relations field so completely that no regulatory agency other than the National Labor Relations Board and no court may assert jurisdiction over unfair labor practices as defined by it, unless expressly authorized by Congress to do so. They claim that state courts accordingly are excluded not only from enjoining future unfair labor practices and thus colliding with the Board, as occurred in Garner v. Teamsters Union, 346 U. S. 485, 74 Sup. Ct. 161, but that state courts are excluded also from entertaining common-law tort actions for the recovery of damages caused by such conduct. The latter exclusion is the issue here. In the Garner case, Congress had provided a federal administrative remedy, supplemented by judicial procedure for its enforcement, with which the state injunctive procedure con-

flicted. Here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from this right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result. The contrary view is consistent with the language of the Act and there is positive support for it in our decisions and in the legislative history of the Act."

The National Labor Management Relations Act of 1947 did not expressly relieve labor organizations from legal liability for unlawful conduct. The United States Supreme Court concluded its opinion by saying:

"If Virginia is denied jurisdiction in this case, it will mean that where the federal preventive administrative procedures are impotent or inadequate, the offenders, by coercion of the type found here, may destroy property without liability for the damage done. If petitioners were unorganized private persons, conducting themselves as petitioners did here, Virginia would have had undoubted jurisdiction of this action against them. The fact that petitioners are labor organizations, with no contractual relationship with respondent or its employees, provides no reasonable basis for a different conclusion."

In holding that the State of Virginia had jurisdiction of the involved controversy between the union and the respondent, the Court clearly construed its opinion in the Garner case.

The evidence is conclusive that the acts and conduct of the intervenor-union induced the defendant-carriers to cease delivering merchandise to petitioner for transportation over its lines and thereby caused petitioner to suffer damages. The acts caused the defendant-carriers to do that which they would not otherwise have done. Petitioner was not required to prove physical force on the part of intervenor. The intervenor adopted a subtle method of approach and accomplished its purpose. The Union was restrained from coercing the employers. The intervenor-union is not in a legal position to complain of an injunction which restrains it from applying a secondary boycott by coercing employers. The defendant-carriers did not appeal and the order granting the injunction as to them has become final.

The injunction order expressly provided that "nothing contained herein shall be construed to enjoin the exercise by any

person of the right of free speech, nor to inhibit the dessemination by lawful means of facts and information concerning any labor dispute." The injunction does not prevent the intervenor-Union or the defendant-carriers from performing any lawful act.

The judgments of the Court of Civil Appeals and the trial court should be affirmed.

Opinion delivered December 15, 1954.

Rehearing overruled January 19, 1955.